# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                    Case No.  19-cv-1319

TODD DYER,

        Defendant.

## BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

      The United States of America, through its undersigned attorneys, respectfully submits this brief in support of its Motion for Judgment on the Pleadings.

## I.  PRELIMINARY STATEMENT

      In this civil action, the United States is seeking a protective order under 18 U.S.C. §§ 1514 and 3771 prohibiting Todd Dyer ("Dyer") from continuing to harass victims of various fraud schemes for which he has been convicted and is serving a prison sentence.  Under Section 1514(b)(1), the Court "shall issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case or investigation if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case or investigation exists[.]" 18 U.S.C. § 1514(b)(1).

      The only issue for the Court to resolve in this case is whether Dyer's conduct constitutes "harassment" within the meaning of 18 U.S.C. § 1514, which defines harassment  as "a serious act or course of conduct directed at a specific person that (i) causes substantial emotional distress in such person; and (ii) serves no legitimate purpose[.]" 18 U.S.C. §§ 1514(d)(1)(B).  Based on the

pleadings and matters of which the Court can take judicial notice, the Court should find that Dyer's conduct constitutes harassment as a matter of law.

As discussed herein, Dyer's allegations in the state court lawsuits he is pursuing against his victims irreconcilably conflict with the facts underlying his criminal convictions. Thus, the lawsuits cannot have a legitimate purpose as they constitute collateral attacks on his criminal convictions, which are invalid under *Heck v. Humphrey,* 512 U.S. 477 (1994) and the doctrine of collateral estoppel. Dyer's letters to his victims threatening them with "embarrassment, expense, and costly, burdensome litigation" likewise serve no legitimate purpose. (*See* ECF 12 at p. 17; ECF 24, ¶¶ 11-23; ECF 1 & Exhibits 7-18.) The Court should grant this Motion and find that Dyer's course of conduct towards his victims and their immediate family members constitutes harassment under 18 U.S.C. § 1514 as a matter of law.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts Conclusively Established By Dyer's Guilty Pleas.

On December 7, 2016, Dyer signed written plea agreements and formally entered guilty pleas in *United States v. Dyer,* Case No. 15-CR-115 (E.D. Wis.)("Farmland Case") and *United States v. Dyer,* Case No. 16-CR-110 (E.D. Wis.)("Insurance Case"). (*See* ECF 1-3, 1-4, 24 (Answer) ¶ 8.) Judgment was entered in both cases. (ECF 1-5, 1-6.) *See* Fed. R. Crim. P. 11(b)(3). As such, Dyer's guilty pleas conclusively establish that Dyer engaged in schemes to defraud his victims comprised of the following facts, which are excerpted from the plea agreements attached to the Verified Complaint as Exhibits 4 and 5. (*See* ECF 1-4, ¶¶ 4-5 & Attachment A; ECF 1-3, ¶¶ 4-5 & Attachment A; *see also* ECF 24, ¶ 8.) *United States v. DiFonzo,* 603 F.2d 1260, 1263 (7th Cir. 1979)("[A] guilty plea is an admission of all the factual allegations contained in the indictment.")

2

### 1. Facts Established By Dyer's Guilty Plea In The Farmland Case

Beginning in approximately March 2008, and continuing until approximately September 2011, Dyer knowingly devised and participated in a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses. (ECF 1-4, ¶¶ 4-5 & Attachment A, p. 1.) The essence of the scheme was to obtain funds from potential investors under the materially false pretenses that their funds would and were being used to purchase farm property or interests in farm property, and that Dyer and his associates had actually purchased farm property. In reality, Dyer and his cohorts purchased no farms, nor interests in any farms, and instead shared the funds obtained from investors among themselves, used the funds for personal purposes, and used the funds to further promote the scheme to defraud. (*Id.*) As a result of the scheme, Dyer fraudulently obtained approximately $1.5 million from investors throughout the United States. *(Id.)*

Dyer was known as the "concept creator" or founder of Midwest Farmland Partners (MFP). MFP was the promotional entity used to solicit investments, purportedly, to purchase Midwest farmland. From approximately March 2008 through approximately September 2011, Dyer offered and sold investments through MFP and its successor entities, including American Farmland Partners (AFP). In order to conceal his past, Dyer used an alias of "Allen Todd" with investors. (ECF 1-4, Attachment A, p. 1.)

#### a. Entities and Functions in Dyer's Scheme to Defraud

##### i. MFP

MFP operated through two related entities, Midwest Farmland Limited Partnership (MFLP) and Midwest Farmland Management Corporation (MFMC). Nicholas Hindman, Sr. ("Hindman") was an Illinois resident Dyer hired in April 2008. Hindman was the Chief Financial

Officer and Secretary of MFLP from in or about 2008 until in or about 2010.  Hindman was also the Chief Financial Officer and Secretary of MFMC. Melvin Krumdick ("Krumdick") was a former Catholic missionary priest with the Maryknoll Order.  From 2008 through 2011, Dyer used Krumdick's religious credentials to lend legitimacy to MFP and AFP.  Krumdick attended investor meetings wearing his clerical collar and represented himself as a "retired" Catholic missionary priest even though Krumdick was dismissed from the Maryknoll Order in 1999 and was no longer authorized to wear his clerical garments, including his collar, in public.  Krumdick was President and Director of MFMC. (ECF 1-4, Attachment A, pp. 1-2.)

Dyer marketed MFP and its entities as an investment vehicle that was to purchase family farms with investor funds whereby the farmers would continue to occupy and operate their farms and investors would profit from, among other things, appreciation in the value of the farm property. Under this structure, as marketed, farmers were to receive cash or partnership interests or stock as payment, or combination of these, for their farms.  (ECF 1-4, Attachment A, p. 2.)

From 2008 to 2010, Dyer offered and sold investors MFLP partnership interests for $1,000 each, which they represented would accrue a 6% fixed annual return.  Dyer incorporated Midwest Farmland Acquisitions Corporation (MFAC), a Wisconsin corporation, in 2008.  MFAC's principal office was located in Lake Geneva, Wisconsin, Dyer's home address.  MFAC was a privately held investment company owned by Dyer and Krumdick.  (ECF 1-4, Attachment A, p. 2.)

No farms and no farmland was ever purchased through MFP or its related entities.  (ECF 1-4, Attachment A, p. 2.)

### ii.     American Farmland Partners

American Farmland Partners (AFP) was a successor entity to, and simply a name change from, MFP and was also used by Dyer to solicit investments purportedly for the purchase of farmland.  AFP also consisted of two related entities, American Farmland Partners Corporation (AFPC) and American Farmland Limited Partnership (AFLP).  No business entity with the name American Farmland Partnership or AFLP was ever formally created.  Hindman incorporated AFPC, an Illinois corporation, on April 5, 2010.  Hindman was President, Secretary, and Director of AFPC.  Dyer solicited investors to purchase stock in AFPC, promising that their investment would rapidly grow as a result of a purported future Initial Public Offering (IPO).  This IPO never occurred. (ECF 1-4, Attachment A, p. 3.)

Dyer offered and sold investors AFLP partnership interests for $1,000 each.  No farms and no farmland were ever purchased through AFP or any of its related entities.  (ECF 1-4, Attachment A, p. 3.)

### iii.     Agri-Business Investors Partnership

On September 17, 2010, Dyer, Krumdick, and a third individual opened a bank account in the name of Agri-Business Investors Partnership (ABIP).  However, no business entity with the name Agri-Business Investors Partnership or ABIP was ever formally created.  Through the terms of a September 25, 2010 buy-out agreement, Dyer, Krumdick, and the third individual received stock warrants in exchange for being bought out of AFP.  (ECF 1-4, p. 18.)  Hindman also agreed to share with them investor proceeds that he obtained from his and Dyer's continued marketing of AFP and its related entities.  (ECF 1-4, Attachment A, p. 3.)

Following the buy-out agreement, Dyer received investor funds through the sale of stock and partnership interests in AFP and its related entities.  Dyer also obtained investor funds through

5

the sale of stock warrants. The proceeds from the sale of these various items were deposited into the ABIP bank account. (ECF 1-4, Attachment A, p. 3.)

### b. General Means By Which Dyer Carried Out The Scheme To Defraud

In order to hide his true identity and past criminal conduct, Dyer used the alias "Allen Todd" when communicating with investors or potential investors. Hindman, Dyer, and Krumdick falsely represented to investors and potential investors that Hindman was a Certified Public Accountant, when in fact the State of Illinois suspended Hindman's CPA license in 1997. Dyer also told investors and potential investors that multiple farms were participating in the project, which was not true, and that the investment entities had purchased farmland, which was not true. Dyer made available to investors and potential investors a DVD about Midwest Farmland Partners which falsely represented the business history and current operations of MFP. (ECF 1-4, Attachment A, pp. 3-4.)

In 2010 and 2011, when Hindman became more of the public face of the investment vehicles, Dyer promoted Hindman to potential investors and Hindman shared the fraudulent proceeds he obtained from these investors with Dyer and Krumdick. Dyer pressured previous investors into making additional investments by warning the investors that if they did not make such additional investments, their current investments would be "worthless." To induce investors and potential investors to invest or provide additional investment funds, Dyer made false representations about how much money had been invested in MFP and AFP. Dyer falsely represented to investors and potential investors that certain required regulatory forms had been filed for the business entities. Dyer continually told investors and potential investors that AFP was going to have an IPO that would greatly increase the value of their investment, however, the IPO never occurred. (ECF 1-4, Attachment A, p. 4.)

6

In order to target more established investors, Dyer advertised the MFP and AFP investments on Chicago classical radio station WFMT, asserting that MFP and AFP had purchased farmland and its investors were already earning interest on their investment in MFP and AFP. In approximately August 2011, Dyer falsely claimed that universities were interested in investing in the farmland entities and that the promoters of the investments were expecting to receive hundreds of millions of dollars from the universities' endowment funds. (ECF 1-4, Attachment A, pp. 4-5.)

Dyer's actions, as described above, involved materially false statements, representations, and promises, concealment of material facts, and attempts to obtain money under materially false pretenses. (ECF 1-4, Attachment A, p. 5.)

### 2. Facts Conclusively Established By Dyer's Guilty Plea in the Insurance Case

From approximately April 1, 2013 to July 15, 2015, Dyer convinced members of the Bakley ("Joan B.") family that the insurance agent who had written a life insurance policy for Joan B. had stolen the insurance policy and made himself the beneficiary of the policy. (*See* ECF 1-3, ¶¶ 4-5 & Attachment A, p. 1.) In truth, and as Dyer well knew, the insurance agent had not made himself the beneficiary of Joan B.'s life insurance policy and had not in any way stolen the policy. Dyer falsely represented that he had highly-placed contacts within the insurance company – North American Company for Life and Health (NAC) – who, for a fee, could assist Dyer to obtain monetary damages from the insurance agent and up to $10 million from the insurance agent's Errors and Omissions insurance policy on behalf of the Joan B. family. In fact, Dyer had no such contacts. (*Id.*)

Dyer admitted in his guilty plea that the following actions were taken in furtherance of his scheme to defraud and obtain money from the Bakley family (ECF 1-3, Attachment A, p. 1):

7

Dyer falsely told members of the Joan B. family that the insurance agent had stolen other life insurance policies that the insurance agent had written for other clients of NAC. In fact, and as Dyer well knew, the insurance agent had not stolen any life insurance policies that he had written for others. Dyer also falsely told members of the Joan B. family that Dyer possessed documents showing that the insurance agent had received premium lapse notices from NAC regarding the Joan B. insurance policy. (ECF 1-3, Attachment A, p. 1.)

Dyer told members of the Joan B. family that he had contacts inside NAC who were aware of the insurance agent's conversion of other life insurance policies that the insurance agent had written for NAC, a statement that Dyer knew to be false. He told members of the Joan B. family that two executives at NAC, one named "Robert" and one named "Carol," were going to help the Joan B. family recover money from NAC by providing information showing that NAC knew about and was liable for the insurance agent's theft of the Joan B. life insurance policy. In fact, and as Dyer then well knew, neither "Robert" nor "Carol" existed. (ECF 1-3, Attachment A, pp. 1-2.)

Dyer, posing as "Robert" and affecting an accent to disguise his voice, called Cindy B., a member of the Joan B. family, frequently to update her on the work that he was doing on behalf of the Joan B. family. Dyer, posing as "Robert," told Cindy B. that the Joan B. family had to pay him, through Dyer, for the work that he was doing on their behalf. Dyer, posing as "Robert," told Cindy B. that NAC was suspicious of his activities and wanted him to take a lie detector test, which he refused to do. Dyer, posing as "Robert," told Cindy B. that a Pennsylvania attorney named "Hershel" was working to obtain money from the insurance agent's Errors and Omissions policy and that the Joan B. family needed to pay "Hershel," through Dyer, for his legal work on their behalf. In fact, and as Dyer well knew, "Hershel" did not exist. (ECF 1-3, Attachment A, p. 2.)

To create a façade of legitimacy to his scheme, Dyer periodically drafted "Consulting Agreements" for the members of the Joan B. family to sign in which they authorized Dyer to work on their behalf and agreed to pay Dyer for his assistance. (ECF 1-3, Attachment A, p. 2.)

Pursuant to the above-described fraudulent scheme, Dyer obtained approximately $937,000 from members of the Joan B. family and used that money for his personal purposes. (ECF 1-3, Attachment A, p. 1.)

### B. Status of Dyer's Criminal Convictions

On March 8, 2017, Dyer was sentenced in the Farmland case to 180 months imprisonment, to be followed by three years of supervised release, and ordered to pay $1,802,483 in restitution to the victims of his scheme, including Mark Borst. (ECF 1-6; ECF 24, ¶¶ 8, 20.) On March 23, 2017, Dyer was sentenced in the Insurance Case to 110 months imprisonment, to be served concurrent to the sentence in the Farmland case, along with 3 years of supervised release, and restitution to Bakley Construction in the amount of $937,000. (ECF 1-5; ECF 24, ¶ 8.)

Dyer appealed his convictions in both cases. On June 13, 2018, the United States Court of Appeals for the Seventh Circuit issued an opinion rejecting all of Dyer's arguments and affirming his convictions. *See United States v. Dyer,* App. Nos. 17-1580, 17-1776, 892 F.3d 910 (7th Cir. June 13, 2018). To date, Dyer has not obtained habeas relief for either of his convictions or otherwise called into question the validity of his convictions.

### C. Facts Established in the Pleadings

The United States filed its Verified Complaint in this action on September 11, 2019. (ECF 1.) Dyer filed his Answer to the Verified Complaint on November 21, 2019. (ECF 24.) As is relevant here, in his Answer Dyer admits that he initiated the lawsuits against Mark Borst, Cindy Bakley, Bakley Construction, and immediate family members of Mr. Borst and Ms. Bakley and

that he sent them the associated correspondence attached to the Verified Complaint. (*See, e.g.,* ECF 24, ¶¶ 11-14, 16-19, 21-23[1].) Specifically, the following facts are undisputed based upon Dyer's Answer in this matter:

### 1. Dyer's Harassment of Mark Borst and the Borst Family

Under the judgment in the Farmland Case, Dyer is obligated to pay Mark Borst $453,417 in restitution. (ECF 24, ¶ 20.)

In or around July 2018, Krumdick sent a letter to Mark Borst in which he stated that he was "preparing a lawsuit to be filed against you, your wife, and your martial assets, in Walworth County." (ECF 24, ¶ 21.) By letter dated July 25, 2018, Mr. Borst, through his attorney, responded to Krumdick's letter. (*Id.*) Months later, on October 29, 2018, Dyer responded to Mr. Borst's letter. (*Id.*)

On December 21, 2018, Dyer, acting through Krumdick, initiated a lawsuit against Mark Borst in Walworth County Circuit Court, Case No. 2018CV00804. (ECF 24, ¶ 22.) On February 20, 2019, Krumdick filed a First Amended Complaint against Mr. Borst and members of his family. (*Id.*)

On May 21, 2019, Dyer sent Mr. Borst's attorney a letter in which he stated, among other things, that he would "be amending the First Amended Complaint" and that the "Second Amended Complaint will include [Dyer] as a Plaintiff as well." (ECF 24, ¶ 23.) Similarly, by correspondence dated June 25, 2019, Dyer sent Mr. Borst's attorney a set of 106 requests for admission, accompanied by an email exchange between Dyer and Krumdick in which Krumdick purportedly authorized Dyer to "sign [his] name as necessary for papers for the Mark Borst Case."

---

[1] Paragraph 23 is a partial denial that admits the majority of the allegations in the paragraph. Fed. R. Civ. P. 8(b)(6).

(*Id.*)  Dyer filed another letter with the Wisconsin Circuit Court in the case against Mr. Borst and his family on September 4, 2019.  (*Id.*)

### 2. Dyer's Harassment of Bakley Construction and the Bakley Family

On or about November 27, 2017, Dyer sent Cindy Bakley a letter in which he demanded that she pay him $500,000 for "breach of the non-disclosure provision of our Advisory/Consulting Agreement" by disclosing the agreement to "the FBI, the IRS, and the U.S. Attorney's Office," among other individuals. (ECF 24, ¶ 11.) The purported "Advisory/Consulting Agreement" was one of the agreements at the heart of Dyer's conduct underlying his conviction in the Insurance Case. (*Id.*)  When Ms. Bakley did not respond, Dyer sent her another letter on January 3, 2018, again demanding $500,000.  (*Id.*)

On September 12, 2018, Dyer filed a lawsuit against Joan Bakley, the Joan Bakley Trust, Cindy Bakley, Kenneth Bakley, Jr., Kathleen Jensen, and Bakley Construction, Inc. in the Circuit Court of the 22nd Judicial District in McHenry County, Illinois.  *Dyer v. Bakley, et al.,* Case No. 18LA00315.  (ECF 24, ¶ 12.)  In his complaint, which Dyer styled as a "Motion for Judgment by Confession and Default," Dyer sought a judgment in the amount of $500,000 "as penalty for the violation of the mutual agreed 'Consulting Agreement.'"  (*Id.*)

In or around early October 2018, Dyer sent a letter to Cindy Bakley and other members of her family in which he threatened to file another lawsuit against the Bakleys if they did not "seek a settlement outside of the purview of the Court."  (ECF 24, ¶ 13.)  Dyer further threatened that his new lawsuit "could be very embarrassing to your family" and that if they did not accede to his demands, Cindy Bakley would "open [her]self up to extreme liability."  (*Id.*)

On December 31, 2018, Dyer went forward and filed his threatened second lawsuit against Joan Bakley, the Joan Bakley Trust, Cindy Jo Bakley, Kenneth Bakley Jr., Kathleen Jensen, and

Bakley Construction in McHenry County Court. *Dyer v. Bakley*, *et al*., Case No. 18LA00436. (ECF 24, ¶ 14.) In that complaint and its attachments, Dyer alleged that the Bakley's recorded telephone conversations with Dyer "and his alleged alter ego(s)(i.e. "Robert") on multiple occasions" violated Illinois "Wiretapping and Eavesdropping Laws." (*Id*.) The alleged recorded conversations that Dyer identifies in his complaint and attachments were, according to Dyer, made in connection with the "Consulting Agreements" between Dyer and the Bakleys. (*Id*.) According to Dyer, Cindy Bakley shared such records with the FBI during the FBI's investigation of Dyer's fraud scheme against the Bakleys. In the lawsuit, Dyer seeks damages in excess of $3,000,000.00. (*Id*.)

The Bakley family retained counsel to defend against Dyer's lawsuits. (ECF 24, ¶ 16.)

On May 24, 2019, Dyer sent another threatening letter to the Bakley's attorney in which he stated that his various lawsuits "subjects [*sic*] the Bakley family to significant civil and potential criminal liability" and demanding, in exchange for dropping his claims, that the Bakley's "loan" $1,000,000 to Dyer's company, Agri-Business Investors Limited Partnership, and provide Dyer with sworn affidavits from the Bakleys addressing some of Dyer's grievances. (ECF 24, ¶ 17.)

On June 25, 2019, the McHenry County Court granted the Bakley's motion to dismiss the first of Dyer's lawsuits, Case No. 18LA000315. (ECF 24, ¶ 18.) On June 24, 2019, Dyer filed a notice of appeal in that case (Appellate Court of Illinois, Second District, Appellate Case No. 19-0568). (*Id*.) On June 25, 2019, the McHenry County Court dismissed without prejudice Dyer's second lawsuit, Case No. 18LA000436, for want of prosecution. (*Id.*) Dyer promptly filed a third lawsuit against the Bakleys on August 19, 2019, in the McHenry County Court, Case No. 19LA244, repeating the allegations previously made in the second suit, Case No. 18LA000436. (ECF 24, ¶ 14.) In this third suit, Dyer again seeks damages exceeding $3,000,000. (*Id*.)

12

### III.  LEGAL STANDARD[2]

"A Rule 12(c) motion for judgment on the pleadings is designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice." *All Amer. Ins. Co. v. Broeren Russo Const., Inc.,* 112 F. Supp.2d 723, 728 (C.D. Ill. 2000*); U.S. v. Wood*, 925 F.2d 1580, 1581–82 (7th Cir.1991).

For purposes of a 12(c) motion, the pleadings "consist of the complaint, the answer, and any written instruments attached as exhibits." *Hous. Auth. Risk Retention Grp., Inc. v. Chi. Hous. Auth.,* 378 F.3d 596, 600 (7th Cir. 2004).  "Among the matters subject to proper judicial notice are state court filings and judicial decisions." *Kane v. Bank of America, N.A.,* 338 F. Supp. 3d 886 (N.D. Ill. 2018).  The Court may also take judicial notice of the previous criminal proceedings against Dyer and the facts admitted in Dyer's plea agreement.  *See, e.g., Frankfurt v. Mega Entm't Grp. II,* No. 15 CV 67, 2018 WL 488258, at *2n.5 (N.D. Ill. Jan. 19, 2018)("Judicial notice may be taken of facts recited in a plea agreement."); *Minnesota Lawyers Mut. Ins. Co. v. Conour,* No. 1:12-cv-1761-WTL-MJD, 2014 WL 5089290, at *5 (S.D. Ind. Oct. 8, 2014)("The Court takes judicial notice of the criminal proceedings against [defendant] and the fact that [defendant] is under a Restitution Order by the criminal court."); *see also, e.g., In re Salem*, 465 F.3d 767, 771 (7th Cir.2006) (judicial notice of state-court dockets and opinions).

A motion for judgment on the pleadings should be granted where, as here, the moving party demonstrates that there are no material issues of fact to be resolved and the moving party is entitled

---

[2] Although the United States initially anticipated filing a motion for summary judgment, this motion can be resolved solely with reference to documents that may be considered in deciding a Rule 12(c) motion, including the pleadings, attachments to the pleadings, and facts and documents subject to judicial notice.

13

to judgment as a matter of flaw. *See, e.g., Maloney v. Alliance Collection Agencies, Inc.,* Case No. 17-cv-1610, 2018 WL 5816375, at *6 (E.D. Wis. Nov. 6, 2018).

## IV.  ARGUMENT

### A.  Dyer's Lawsuits Against His Victims And Associated Contacts With His Victims Serve No Legitimate Purpose

The allegations in Dyer's lawsuits against his victims are irreconcilable with the facts conclusively established by Dyer's guilty pleas.  As a result, regardless of Dyer's subjective intent, they constitute an impermissible collateral attack on Dyer's valid criminal convictions, which is not a legitimate purpose for a civil lawsuit.  *Heck v. Humphrey,* 512 U.S. 477 (1994).  The Court should grant this motion and find that Dyer's lawsuits against his victims and associated threats and contracts serve no legitimate purpose as a matter of law.

In *Heck,* the Supreme Court held that a civil lawsuit that by its nature challenges the validity of a conviction or sentence is not cognizable unless or until the sentence or conviction is "reversed on direct appeal, expunged by executive order, declared in invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."  *Heck,* 512 U.S. at 487.  *Heck's* favorable termination requirement is intended to avoid "the possibility of the claimant succeeding in the tort action after having been convicted in the underlying prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolution arising out of the same or identical transaction."  *Heck,* 512 U.S. at 484.  "The principle of *Heck* is that a civil suit which necessarily challenges the validity of the plaintiff's conviction cannot be maintained until and unless the plaintiff gets his conviction set aside, even if he does not seek in the civil suit a remedy that would undo his conviction."  *Apampa v. Layng,* 157 F.3d 1103, 1105 (7th Cir. 1998).

14

A civil lawsuit runs afoul of *Heck* where the allegations in the civil lawsuit are inconsistent with the facts underlying a criminal conviction. *See, e.g., Okoro v. Callaghan,* 324 F.3d 488 (7th Cir. 2003) ("Okoro [plaintiff] adhered steadfastly to his position that there were no drugs, that he was framed; in so arguing, he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit, other than a suit under the habeas corpus statute ...."); *Helman v. Duhaime,* 742 F.3d 760, 762 (7th Cir. 2014)(*Heck* barred civil lawsuit where "Helman's version of the facts would necessarily imply the invalidity of his state court conviction for resisting law enforcement . . . Accordingly, under *Heck,* Helman may not pursue a § 1983 claim premised upon that scenario.")

Although it is most frequently applied in the context of Section 1983 claims, "*Heck's* logic extends outside of constitutional claims and applies to any claim—including state-law claims— based on factual allegations that are necessarily inconsistent with the validity of a conviction that has been neither reversed, expunged, nor otherwise declared invalid." *Puckett v. Walmart Store & 5823,* No. 3:15-CV-2029-D-BN, 2017 WL 6612944, at *8 (N.D. Tex. Nov. 6, 2017). "Courts have extended *Heck's* rationale beyond the context of § 1983 to a variety of situations where a plaintiff has been convicted of a federal crime and later files a civil action which, if successful, would necessarily imply the invalidity of the plaintiff's conviction." *Terry v. U.S. Small Bus. Admin.* 699 F. Supp. 2d 49, 55-56 (D.D.C. 2010); *see also, e.g., Davit v. Davit,* 366 F.Supp.2d 641, 653 & n. 10 (N.D.Ill.2004); *Derrow v. Bales,* No. 06–CV–137, 2007 WL 1511997, at *3 (E.D.Tex. May 22, 2007) (*Heck* barred claims under the APA and Privacy Act).

Dyer's civil lawsuits against his victims run afoul of *Heck* in multiple respects. As an initial matter, the lawsuits rest largely on allegations that Dyer's victims provided false information

15

to law enforcement in connection with the circumstances leading to Dyer's conviction. With

respect to Mark Borst,[3] Dyer alleges that:

> 30. [Mark Borst], Plaintiff[4], and others had contracts, verbal and written, as enumerated in this Complaint relating to possession, conversion, income and the eventual sale of securities issued to [Mark Borst] and Plaintiff's designate, AGRI BUSINESS INVESTORS LIMITED PARTNERSHIP. These contracts created obligations. Those obligations were breached, and as a result, Plaintiff and others were damage. [Mark Borst] breached his contract with Plaintiff through the following acts or omissions:

> 31. [Mark Borst] and others convinced the State of Wisconsin, Department of Securities, State of Illinois, Securities Department, FBI, IRS, US Attorney Office in Wisconsin, and investors that [Mark Borst] was a passive, unknowing investor who had been victimized by Plaintiff and that [Mark Borst] had bought Plaintiff's American Farmland Partners Corporation stock warrants in a 2012 transaction.

> 32. In truth, and as [Mark Borst] well knew, Plaintiff continues to own and control all business concepts, intellectual property, and trade secrets.

(*See* ECF 1-17, pp. 4-5; *see also* ECF 24 ¶ 22.) Similarly, in his lawsuits against Bakley

Construction and members of the Bakley Family (collectively, the "Bakleys"), Dyer alleges

(among many other similar allegations) that:

> **13. [The Bakleys] concealed their actions and culpability in this possible insurance fraud scheme by making repeated, charging, false statements to the FBI and U.S. Attorney's Office in Wisconsin and evidenced by more than ten (10) FBI Memorandum of Interviews. [The Bakleys'] false statements alleging they paid [Dyer] more than $900,000 to steal evidence from [Dyer's] father, James Dyer's home and office and from an alleged contact at North American Company for Life and Health (NACLH) as a means of getting a ten (10) Million dollar settlement from [Dyer's] father's Errors and Omissions**

---

[3] The lawsuit against Mark Borst, Sydney Borst (Mr. Borst's wife), and Daniel Borst (Mr. Borst's brother) includes no allegations whatsoever concerning Sydney Borst or Daniel Borst, further confirming that they were named as defendants solely for the purpose of harassing Mark Borst.

[4] The Plaintiff in the lawsuit against Mark Borst is Melvin Krumdick in his individual and various representative capacities, including "Managing General Partner of the Agri Business Investors Limited Partnership" and as trustee of the "Todd A. Dyer Irrevocable Trust Dated 1994" and the "TAD3 Trust Dated 2017." (TAD happens to be Todd A. Dyer's initials.) Dyer admits that he caused the lawsuit against Mark Borst to be initiated or that he has been directly involved in the lawsuit. (*See* ECF 24, ¶¶ 22-23.)

**insurers (as alleged in Wisconsin criminal case 16-CR-100) conflicts completely with the "burner" telephone recordings made by [the Bakleys], with the email records, with more than ten (10) Consulting Agreements and the Disclosure document.** The aforementioned tangible records, including the "burner" telephone recordings by contrast, state [the Bakley's] will pay [Dyer's] father $200,000 for filing a frivolous suit against him, and [Dyer] more than $900,000 for structuring a settlement and release from a possible countersuit by [Dyer' father, James Dyer.

\* \* \*

1. [*sic*]  Beginning on or about April 2013, [Dyer] and [the Bakleys] entered into a series (more than 10) of Consulting Agreements herein known as the "Consulting Agreement".    [The Bakley's] execution of more than ten (10) Consulting Agreements eliminates any defenses or an allegation of duress or unknown contents/provisions of said Consulting Agreements.  The Consulting Agreement was mutually agreed by both [Dyer] and the [Bakleys] and was construed in a legal and lawful manner and never were any illegal or unlawful service or conduct expected or implied by either party.  **[The Bakleys] later falsely memorialized and testified to the FBI that [Dyer] was hired by [the Bakleys] to steal evidence from James Dyer, his company, and others in order to induce a suit involving James Dyer's Errors and Omissions insurance.  [The Bakleys'] repetitive alterations as to the series of events constitutes perjury.**

\* \* \*

3.  Contained within the Consulting Agreement is the existence of a binding non-reliance clause, stating the following: "There are no warranties or guarantees express or implied other than those listed in the Agreement."  **Based upon this clause, [Dyer] and [the Bakleys] had a mutual agreement that [Dyer] was to perform the work outlined in the Consulting Agreement and that at no time were there nefarious plans such as [the Bakleys], specifically Cindy Jo Bakley, testified to investigators in successive, changing, perjured interviews.**

(ECF 1-13, pp.  4, 7-8; *see generally* ECF 1-11, 1-12)(emphasis added).

In addition to alleging that his victims lied to law enforcement—and equally problematic under *Heck*—the factual allegations in Dyer's lawsuits are fundamentally inconsistent with the facts that he admitted in his guilty pleas (summarized in Sections II(A)(1)-(2) above).  For example, contrary to the admission in his guilty plea that his various business entities were used for the sole purpose of accomplishing a fraud scheme, Dyer alleges in his lawsuit against Mark

Borst and his family members that the various entities were in fact legitimate business entities in the business of acquiring farmland. (*See generally* ECF 1-17). Dyer alleges that Mr. Borst was a creditor who "loaned" money, rather than a victim of Dyer's fraud scheme. (*See id.,* ¶¶ 18, 25.) These allegations are contrary to the facts established by Dyer's guilty plea.

Similarly, Dyer's allegations against the Bakleys in the lawsuits against them are premised on the theory that the various Consulting Agreements that Dyer admits that he used to accomplish his fraud scheme were legitimate agreements, rather than instruments used to defraud the Bakleys as he admitted with his guilty plea. (*See, e.g.,* ECF 1-13, pp. 7-14; *see also* ECF 1-11, 1-12.) Indeed, in a characteristically blatant attempt to undermine his fraud conviction, Dyer includes a variety of allegations suggesting that the Consulting Agreements were part of a "mutual business relationship" and not used for any "nefarious plans." (*See* ECF 1-12, pp. 5-6; ECF 1-13, pp. 7-8.) To be clear, there are no other "agreements" at issue between the Bakleys and Dyer except those at the heart of Dyer's insurance fraud scheme, which Dyer admitted he crafted to "lend the appearance of legitimacy to the fraud scheme." (ECF 1-3, ¶ 5; *see also* ECF 24, ¶ 11.) Further, Dyer's claim that he was illegally recorded in violation of Illinois law is based on the false premise that he was not engaged in a scheme to defraud Cindy Bakley at the time the recordings were allegedly made. 720 ILCS 5/14-3(i)(exempting from the law "Recording of a conversation made by . . . a person, not a law enforcement officer or agent of a law enforcement officer, who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household, and there is reason to believe that evidence of the criminal offense may be obtained by the recording").

18

Based on these inconsistencies, none of Dyer's lawsuits against his victims survive *Heck*. Moreover, even if there was some theoretical possibility that the facts alleged in Dyer's complaint could somehow exist in the same universe as the facts underlying Dyer's criminal convictions (though there is not), such a theoretical possibility is not enough to prevent application of *Heck*. *Okoro*, 324 F.3d at 490 (explaining that the district court rejected application of *Heck* "because of the theoretical possibility . . . that the defendants had both found illegal drugs in Okoro's home and stolen gems and cash that they also found there. This was error. Okoro adhered steadfastly to his position that there were no drugs, that he was framed; in so arguing he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit, other than a suit under the habeas corpus statute."). It is irrelevant whether Dyer "disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with his conviction's having been valid, *Heck* kicks in and bars his civil suit." *Id.* at 490.

In sum, because the factual allegations in Dyer's lawsuits against his victims are necessarily inconsistent with the facts established by Dyer's guilty pleas, Dyer's lawsuits against his victims are, at best, a collateral attack on his criminal convictions. This is not a legitimate purpose for a civil lawsuit under *Heck*.

### B. Collateral Estoppel Dyer's Claim That His Lawsuits Serve A Legitimate Purpose

Collateral estoppel also precludes Dyer from presenting evidence or argument inconsistent with his guilty pleas in this lawsuit—whether to attempt to show that his lawsuits against his victims serve a legitimate purpose or for any other reason.

"Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326

19

(1979)(citation omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a difference cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980)(citation omitted). Collateral estoppel may be used offensively where, as here, a plaintiff seeks to prevent the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with the plaintiff or another party." *Id.* at 326 n.4.

"It is well-established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 579 (1951). "In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." *Id.* A judgment based on a guilty plea has the same preclusive effect as judgment based on a verdict.[5] *See, e.g., Plunkett v. Commissioner,* 465 F.2d 299, 305-07 (7th Cir. 1972). Indeed, "[i]n this Circuit, a criminal conviction based upon a guilty plea conclusively establishes for purposes of a subsequent civil proceeding that the defendant engaged in the criminal act for which he was convicted." *Nathan v. Tenna,* 560 F.2d 761, 763 (7th Cir. 1977); *United States v. Parmelee,* 42 F.3d 398, 398 (7th Cir. 1994)("Parmelee having pleaded guilty to membership in the conspiracy as charged in the indictment knowingly and intelligently, and with the advice of counsel . . . has relinquished the right to challenge the conspiracy.").

---

[5] As one court explained, this is because, among other reasons, "[a]lthough a guilty plea eliminates the need for a contested trial, a federal court cannot enter judgment upon the plea unless it determines that a factual basis exists for it." *Matter of Raiford,* 695 F.2d 521, 523 (11th Cir. 1983)(citing Fed. R. Crim. P. 11(f)). "A federal criminal defendant wishing to avoid both a trial and any collateral estoppel effects may ask for court permission to plead *nolo contendere." Id.* (citing Fed. R. Crim. 11(b) & advisory committee note; Fed. R. Evid. 803(22)). "A defendant who fails to exercise this option cannot argue subsequently that the lack of a contested trial renders his plea ineffective for collateral estoppel purposes." *Id.*

Here, application of collateral estoppel yields the same result as application of *Heck*: as a matter of law, Dyer's lawsuits against his victims serve no legitimate purpose. As one pre-*Heck* Court reasoned based on collateral estoppel when presented with similar circumstances:

> It is obvious that the plaintiff is attempting to build a Northwest passage in order to attack his conviction and he has dressed this passage in the form of a civil suit. To sanction such a case through the civil mechanism of a tort suit after there has been full trial and full appellate proceedings, would be to create a novel form of collateral attack. Once the criminal process has run its full course, it must be impervious to this type of attack.

*Byrd v. Smith*, 693 F. Supp. 1199, 1201 (D.D.C. 1986).

Here, as in *Byrd*, collateral estoppel precludes Dyer from advancing theories that contradict the facts established by Dyer's criminal convictions in this civil proceeding. There is no material fact as to whether Dyer engaged in the conduct he admitted as part of his guilty pleas, and he is not entitled to advance theories that are inconsistent with his guilty pleas in this proceeding. *Nathan*, 560 F.2d at 763 ("Nathan's guilty plea . . . conclusively establishes that his conduct was criminal, and Nathan may not present evidence to the contrary in this civil proceeding. Hence, no material issue exists as to whether Nathan engaged in illegal conduct.").

In sum, Dyer is collaterally estopped from attempting to relitigate the facts underlying his criminal convictions in this proceeding. The Court should find that Dyer's lawsuits against his victims and related contacts with his victims serve no legitimate purpose as a matter of law.

## C. Cindy Bakley, Bakley Construction, And Mark Borst Are "Victims" Under 18 U.S.C. § 1514

The plea agreements and restitution orders in the Insurance Case and Farmland Case each establish that Cindy Bakley, Bakley Construction, and Mark Borst are victims of Dyer's fraud schemes. *See* 18 U.S.C. § 3771(e)(defining a "victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of

Columbia"); *Nat'l Treasury Emps. Union v. Chertoff,* 452 F.3d 839, 857 (D.C. Cir. 2006)("There is a presumption that Congress uses the same term consistently in different statutes"); *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 233 (2005)(beginning statutory interpretation "with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes").  In the plea agreement in the Insurance Case, Dyer admitted that he harmed Cindy Bakley and other members of the "Joan B." (Joan Bakley) family by engaging in an elaborate fraud scheme against them.  (*See* ECF 1-3, ¶¶ 4-5 & Attachment A.)  The restitution order entered in the Insurance Case reflects that the fraud scheme resulted in a restitution order of $937,000 in favor of the Bakley Construction company, further illustrating the significance of the harm that Dyer's fraud caused the Bakley family and Bakley Construction. (*See* ECF 1-5, p. 4.)  Likewise, in the plea agreement in the Farmland Case Dyer admitted that he knowingly devised and participated in a scheme to defraud multiple victims.  (ECF 1-4, ¶¶ 4-5 & Attachment A.)  The restitution order specifically identifies those victims, including Mark Borst (to whom Dyer owes $453,417) and others, and confirms the extent of the financial harm that Dyer's conduct caused his victims.  (ECF 1-6, pp. 5-6.)

Thus, Cindy Bakley, Bakley Construction and Mark Borst are victims of Dyer's crimes as a matter of law, and their immediate family members are "specific persons" entitled to protection under 18 U.S.C. § 1514.  18 U.S.C. § 1514(d)(1)(G)(defining a "specific person" as "a victim or witness in a Federal criminal case or investigation, and includes an immediate family member of such victim or witness."); *see also* 18 U.S.C. § 1514(d)(1)(C)(incorporating definition of "immediate family member" in 18 U.S.C. § 115(c)(2)).

### D. Dyer's Repeated State Court Filings And Letters To Victims Constitute A "Course Of Conduct" As Defined In 18 U.S.C. § 1514(d)(1)(A)

Dyer's lawsuits against his victims and their immediate family members and related communications to his victims constitute a "series of acts over a period of time . . . indicating a continuity of purpose."  18 U.S.C. § 1514(d)(1)(A)(defining "course of conduct").  The Court should therefore find that Dyer's conduct towards his victims and their immediate family members constitutes as "course of conduct" as a matter of law.

### E. Dyer's Harassment Of His Victims Has Caused Them To Experience Substantial Emotional Distress

In *U.S. v. Tison*, 780 F.2d 1569 (11th Cir. 1986), which also involved "harassment" under 18 U.S.C. § 1514 that consisted of state court litigation, the court noted that "[t]he substantial emotional distress prong of the harassment test is virtually conceded" and that the defendant had stipulated at the hearing that "'the prospect of being sued is likely to be worrisome to anybody.'" *Id*. at 1571-72.  Here, too, there is no serious question that Dyer's lawsuits against his victims and related letters to his victims—in which he demands hundreds of thousands or millions of dollars from individuals whom he already defrauded—would cause any target of such conduct to experience substantial emotional distress.  As the Court stated it in its October 2, 2019 Order, Dyer's "threatening, bullying contacts, while portraying himself as the victim and asserting that he is protecting himself from the victims, seem the very definition of harassment." (ECF 12, p. 17.)

Although Dyer denies in his Answer that his conduct caused his victims to experience substantial emotional distress on the grounds that he "lacks knowledge or information sufficient to form a belief as to the allegations contained therein,"  (*see* ECF 24,  ¶¶ 19, 25), based upon the record in this case and the records of the Farmland and Insurance cases, the only reasonable

inference to be drawn is that Dyer's conduct has caused his victims and their immediate family members to experience substantial emotional distress. (*See* ECF 1, ¶¶ 19, 25 & Exhibits 22-23.) To the extent that the Court finds that the record is not sufficient, this would be the sole issue to be addressed at a hearing in this matter.

## V.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant this Motion for Judgment on the Pleadings and enter the requested protective order. (ECF 2.)

Dated this 3rd day of April, 2020.

MATTHEW D. KRUEGER
United States Attorney

By:     /s/   Emily A. Constantine

EMILY A. CONSTANTINE
Assistant United States Attorney
Wisconsin Bar No.1087257
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, WI  53202
Telephone: (414) 297-1700
Fax: (414) 297-4394
emily.constantine@usdoj.gov

24