

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

FROM: 05409089
TO: Blumling, Ryan; Bolton, Tracy; Krumdick, Father Mel; Penegor, Attorney R
SUBJECT: Motion to Determine Ownership of Stock Warrants
DATE: 01/22/2022 02:18:47 PM

2022 FEB -1 P 1: 30

ERK OF COUR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Case No. 19-CV-1319 Temporary Restraining Order

UNITED STATES OF AMERICA,
Plaintiff,

v.

TODD A. DYER,
Defendant,

MOTION REQUESTING COURT DETERMINE OWNERSHIP OF THE AMERICAN FARMLAND PARTNERS CORPORATION
STOCK WARRANTS

NOW COMES Todd Dyer, Pro Se with his Motion Requesting Court Determine Ownership of the American Farmland Partners
Corporation Stock warrants, and offers in support the following;

Establishing, as a matter of law, who owns the American Farmland Partners Corporation (AFPC) stock warrants is relevant and
necessary to establishing whether Father Melvin E. Krumdick (Father Mel) and Todd Dyer (Dyer), individually, and/or through
their designatee, the Agri Business Investors Limited Partnership (ABILP) have standing to proceed against Mark Borst (Borst),
Nicholas C. Hindman, Sr. (Hindman) and the other 15-CR-115-JPS "Farmland" (115Farmland) case victims.

Background

Borst, Father Mel and Dyer received four million stock warrants in AFPC in connection the September 25, 2010 buyout
agreement (Exhibit #1) wherein AFPC bought the business model, intellectual property and trade secrets developed by Dyer for
Midwest Farmland Partners (MFP).

The stock warrants were not issued to Borst, Father Mel and Dyer individually, but to their designatee, Illinois based Agri
Business Investors LIMITED Partnership (ABILP), as evinced by the stock warrant attached to the buyout agreement.

ABILP was not yet formed when the buyout agreement was executed.

Borst, Hindman and the other 115Farmland case victims claim Father Mel and Dyer do not have standing to proceed against
them because Father Mel and Dyer allegedly sold their share of the stock warrants issued in connection with the September 25,
2010 buyout to Borst in a number of secondary buyouts which occurred in late 2011, and early 2012, leaving Borst as the sole
owner of the American Farmland Partners Corporation stock warrants.

Upon execution of the September 25, 2010 buyout agreement, Midwest Farmland Limited Partnership (MFLP) became
American Farmland Limited Partnership (AFLP), an entity controlled by AFPC.

As agreed to in the September 25, 2010 buyout agreement, Father Mel and Dyer were to also maintain an ownership stake in
AFLP, through AFPC, and to receive commissions when AFLP made land acquisitions.

The actual September 25, 2010 buyout agreement was between AFPC as purchaser, and Borst, Father Mel, and Dyer as
sellers. ABILP was the recipient of the stock warrants which constituted consideration for the buyout.

As noted in other submissions to the government and court, there were two Agri Business Investors Partnership entities,
Wisconsin based Agri Business Investors GENERAL Partnership (ABIGP), formed in 2010, and the Agri Business Investors
LIMITED Partnership (ABILP), formed in October 2, 2014.

Father Mel and Dyer claim the AFPC stock warrants are now, and have always been, owned by ABILP.

Consequently, Father Mel and Dyer, through Illinois based ABILP, have standing.

In support of this claim, all AFPC stock warrants sold and signed by Borst in 2010 and 2011, were in the name ABILP.

Father Mel and Dyer concede, they have no standing in Wisconsin based Agri Business Investors GENERAL Partnership (ABIGP), and that their standing in that entity was terminated September 25, 2010 as documented in the secondary buyouts.

Borst, Hindman, and the 115Farmland case victims allege falsely that, ABIGP owns the AFPC stock warrants.

On December 22, 2011 Borst bought Dyer out of ABIGP. (Exhibit #2). This secondary buy out stated; in part;

"Agri Business General Partnership ("ABIGP") and Todd Dyer ("TAD") in consideration of $25,000, receipt of which is here acknowledged by TAD, the parties hereto confirm and agree:

1. TAD has not had and shall not have any managerial control over, or equity interests in ABGP hereafter, nor has TAD had any equity, managerial, or other interest in AFPC or any partnership of which AFPC is or has been a general partner, including MIDWEST FARMLAND LIMITED PARTNERSHIP and AMERICAN FARMLAND LIMITED PARTNERSHIP, since the BUYOUT AGREEMENT of 9/23/2010, and modified 9/30/2010, designating ABGP as the recipient of the Warrant which constitutes consideration for the buyout."

The secondary buyout of Father Mel from ABIGP by Borst occurred on January 12, 2012 (Exhibit #3), and the language of that agreement "parrots" that contained in the Dyer secondary buyout.

The modification of September 30, 2010 referenced in the aforementioned secondary buyouts of Father Mel and Dyer redesignating the AFPC stock warrants from ABILP to ABIGP was never executed.

In support of this claim, a July 27, 2011 email from Hindman to Dyer documents Hindman's concerns that the Agri Business Partnership needs to amended to reflect the proper partnership name. (Exhibit #4).

Obviously, if Hindman was still trying to execute a resignation of the stock warrants in July 27, 2011, the September 30, 2010 modification/redesignation had not occurred.

Attached to Hindman's July 27, 2011 email was a copy of the ABIGP Partnership Agreement which valued ABIGP at 10 million dollars (10,000 partnership interests X $1,000 per interest). (Exhibit #5).

This 10 million dollar valuation is believed to coincide with FPI's October 29, 2014 press release entitled "Farmland Partners Announces 10 Million Stock Repurchase Program".

In further support of the fact that the September 30, 2010 modification/redesignation never occurred, a December 19, 2011 email from Hindman to Borst, Dyer and Hook (Exhibit #6) again revisits the unresolved modification/redesignation issue wherein Hindman is still attempting to change the recipient of the AFPC stock warrants from ABILP to ABIGP.

On December 20, 2011, Hindman sent Dyer an email with documents attached entitled "confirmation" and "redesignation" wherein Hindman requested Borst, Dyer and Father Mel fraudulently backdate the "redesignation" document changing the recipient of the AFPC stock warrants from ABILP to ABIGP. (Exhibit #7).

As noted, no redesignation was ever executed, not on September 30, 2010 or, on any other date.

Consequently, the owner of the AFPC stock warrants remained ABILP.

Borst and Hindman's contradictions, vacillations and deception, relative to Father Mel, Dyer, and ABILP's standing and involvement in AFPC and AFLP, are revealed in the following documents.

According to Borst's Form 302, Memorandum of Interview (MOI) of November 25, 2014, (page 9 of 14)(Exhibit #X) Borst bought the stock warrants issued to Borst, Father Mel and Dyer for $25,000 each.

Borst's MOI states, in part;

"Sometime in late 2010 or 2011, Borst received at least two unsolicited telephone calls from someone who claimed to be interested in purchasing Agri-Business. The caller, who spoke with an Indian accent, did not identify himself and was evasive when asked his identity. The caller stipulated that he would not make a formal offer until Dyer's and Krumdick's associations with the business were terminated."

"BORST responded by negotiating the purchase of DYER's and KRUMDICK's shares for $25,000 each. BORST paid for their shares with cashiers checks drawn on BORST's account at First Banking Center."

On February 19, 2012, following Borst's buyout of Father Mel from ABIGP, Hindman sent all previous Midwest Farmland Partners (MFP) and American Farmland Partners (AFP) officers, directors and investors a letter stating falsely that Borst had bought Father Mel and Dyer out, with the assurances to investors that, AFPC would be moving forward. Exhibit #8.

The February 19, 2012 letter was not sent to Father Mel or Dyer at the time, but was forwarded later by friendly investor, Robert Woolfolk.

Hindman's letter stated, in part;

"Mark Borst, who bought Dyer and Krumdick out of ABIP [Agri Business Investors Partnership] ..."

"Todd Dyer has been dispatched from the farmland venture for good reason. His ultimate and final exclusion should bring back the farm oriented officers that he scared away."

"We will move forward in 2012."

On May 1, 2012 Hindman sent an email to Borst, Father Mel, Dyer and the 115Farmland case victims in response to Dyer's request for the records and financials of AFPC and AFLP. In the response, Hindman refused Dyer's request, stating that neither Dyer nor any of Dyer's "conduit entities" were investors in AFPC. (Exhibit #9).

FPI went public in April of 2014.

As previously noted, on October 29, 2014, following the expiration of the company's six month "lock up" period, FPI did a press release entitled "Farmland Partners Announces 10 Million Stock Repurchase Program." (Exhibit #10).

The 10 million dollars referenced, according to Father Mel and Dyer coincides with the 10 million dollar valuation placed on ABIGP, and represents a select group of the 115Farmland case victims being paid for their original investments in Midwest and American, excluding Father Mel, Dyer, and perhaps others.

In contradiction to Borst and Hindman's claim that ABIGP owned the AFPC stock warrants, and that Father Mel and Dyer had no standing, a letter from Dyer's attorneys at Rizzo and Diersen Law dated May 12, 2015 (Exhibit #11) documents Hindman received a request to converted 1,000 of ABILP's 5.5 million stock warrants in AFPC to common shares.

Hindman converted the AFPC stock warrants, and issued 1,000 common shares AFPC to the ABILP. (Exhibit #12).

On June 3, 2015, following the conversion of ABILP's stock warrants to AFPC common shares, Dyer's then attorney, Troy Owens (Owens) made a request of Hindman via certified mail for AFPC and AFLP records, on behalf of Father Mel, Dyer and ABILP, as shareholders. (Exhibit #13).

On July, 29, 2015, Hindman responded by email to Owens that, he would provide the documents requested within 14 days, as requested, (Exhibit #14) supporting Father Mel and Dyer's claim that ABILP still had standing.

Hindman failed to produce the requested records, as promised.

On April 14, 2016, Dyer's then attorneys Johnson & Bell Law of Chicago made an additional request of Hindman via certified mail for all AFPC and AFLP records on behalf of Father Mel, Dyer and ABILP, as shareholders. (Exhibit #15).

Hindman did not respond to the request.

In an August 2018 email exchange between Hindman and Father Mel (Exhibit #16), Hindman again returned to his claims that

Father Mel and Dyer sold their AFPC stock warrants to Borst for $25,000.

Hindman's August 29, 2018 email stated, in part;

"Mel:

First, Mark is not one of "my" victims that was all you and Todd. I also believe he is sole owner of Agri Business Investors Partnership anyway, you and Todd have no standing in that company since Mark bought you and Todd out for $25,000 each, in case you forgot.

Do not contact me again, or I will go to the US Attorney's office and the Judge concerning your harassment, and perhaps they will reconsider their charges against you.

I would stay out of this if I were you, there is nothing to win, and a lot for you to lose, including your freedom."

Nick"

On July 24, 2020 Hindman filed a response to a motion for default judgment in the Dupage County Illinois Writ of Mandamus case (Case No. 19-MR-746) wherein Father Mel, Dyer and ABILP again requested the records of AFPC and AFLP as is their right as shareholders. (Exhibit #17).

Hindman claimed in his response that, he had no records, there was no intellectual property (IP) or trade secrets, and referred to Dyer's business model as "failed".

Conclusion

Based on the forgoing, establishing who owns the American Farmland Partners Corporation stock warrants is necessary to establish Father Mel, Dyer and the Agri Business Investors LIMITED Partnership (ABILP) as the legal owner of the AFPC stock warrants, and consequently, Father Mel, Dyer and ABILP standing, the existence of a meritorious lawsuit against Borst, and future lawsuits against Borst, Hindman, the 115Farmland case victims, publicly-traded Farmland Partners, Inc. (FPI: NYSE), and FPI's affiliated, private, limited partnership, Farmland Partners Operating Partnership, L.P.

Respectfully submitted,

Todd Dyer
Reg. #05409-089
Federal Prison Camp Yankton
P.O. Box 1000
Leavenworth, KS 66048

Certificate of Service

I hereby certify that on January 31, 2022 I did serve a true and correct copy of the Motion Requesting Court Determine Ownership of the American Farmland Partners Corporation stock warrants via first class US mail to the clerk of court and request the same be shared with all relevant parties through the courts electronic mail system.

Todd Dyer
Reg. #05409-089
Federal Prison Camp Leavenworth
P.O. Box 1000
Leavenworth, KS 66048

EXHIBIT
# 1

# AMERICAN FARMLAND PARTNERS CORPORATION

## FOUNDER'S BUY OUT AGREEMENT

September 25, 2010

# FOUNDER'S BUY OUT AGREEMENT

AFPC - BUY OUT AGREEMENT ................................................................................ 1-5

AFPC - WARRANT FORM ...................................................................................... 6-11

AFPC - AGREEMENT NOT TO SUE .................. ...................................................... 12

AFPC - AGREEMENT AS TO BUY OUT AGREEMENT ...................................................... 13

AMERICAN FARMLAND PARTNERS CORPORATION ..... Private Placement Memorandum

## BUY OUT AGREEMENT

AMERICAN FARMLAND PARTNERSHIP CORPORATION, an Illinois Corporation, ("AFPC") hereby AGREES to BUY OUT and SELLERS, being MARK BORST("MARK"), MEL KRUMDICK ("MEL"), and TODD DYER ("TODD"), for them-selves and on behalf of their assigns and successors, if any, jointly and severally, AGREE TO SELL OUT the entire right, title and interest of the SELLERS, each and all, in whatever form or entity held, IN MIDWEST FARMLAND LIMITED PARTNERSHIP ("MFLP"), MIDWEST FARMLAND MANAGEMENT CORPORATION ("MFMC") and any other FARMLAND CONCEPT(S) RESEARCHED AND DEVELOPED by TODD DYER (excluding The Agricultural Network), or by others under his direction, control or otherwise, owned, controlled, or otherwise directed by each or all or others in each or all of their behalves, including all copyrights, trademarks, service marks, and rights thereto, contractual, tangible and intangible property, and other rights necessary, proper, or desirable for development and exploiting the foregoing and for carrying on a business or businesses based thereon, and including all extant and contemplated websites (excluding The Agricultural Network), whether created by one or more of the SELLERS, ZOOFX, or otherwise, (the "ASSETS") free of all debt or other obligation, FOR THE FOLLOWING CONSIDERATIONS:

IN EXCHANGE FOR THE FOREGOING AND SELLERS' AGREEMENTS OF CONFIDENTIALITY, STAND STILL, ARBITRATION, NON-COMPETE, NON-CIRCUMVENTION, CERTIFICATE OF FULL DISCLOSURE AS TO INVES-TORS, FUNDS RECEIVED, FUNDS DISBURSED, AND ASSETS LOCATION, AFPC WILL ISSUE TO SELLERS DESIG-NEE, THE AGRI-BUSINESS INVESTORS LIMITED PATNERSHIP (ABILP) A TRANSFERABLE TEN YEAR WARRANT PROVIDING FOR THE PURCHASE OF FOUR MILLION COMMON SHARES OF AFPC OF THE FORM ATTACHED HERETO AND EXERCISABLE IN WHOLE OR IN PART DURING THE TERM OF THE ORIGINAL WARRANT AT ONE DOLLAR PER SHARE, AND AGREES TO SELL ITS COMMON SHARES (THE ONLY CLASS OF STOCK) FOR AT LEAST $2.50 PER COMMON SHARE IN A PRIVATE PLACEMENT SCHEDULED TO IMMEDIATELY FOLLOW THE EXECUTION OF THIS AGREEMENT, AND AGREES TO SELL ITS COMMON SHARES FOR AT LEAST $5.00 IN AN INITIAL PUBLIC OFFERING TO OCCUR NO LATER THAN 1YEAR FROM THE EXECUTION OF THIS AGREEMENT. IF AFPC HAS NOT RAISED AT LEAST $5,000,000 OF EQUITY BY SEPTEMBER 23, 2011, AFPC SHALL ISSUE AN ADDITIONAL 1,500,000 WARRANTS IN THE FORM ATTACHED HERETO TO SELLERS OR THEIR ORDER WITHIN 15 DAYS THEREAFTER.

CURRENTLY THERE ARE COMMON SHARES OUTSTANDING WITH ADDITIONAL COMMON SHARES CONTEM-PLATED UPON THE EXECUTION OF THIS AGREEMENT AS FOLLOWS: 2,000,000 COMMON SHARES (ISSUED) TO FRANK IMPARATO, 1,000,000 COMMON SHARES (CONTEMPLATED) TO NICHOLAS C. HINDMAN, SR., 500,000 COMMON SHARES (CONTEMPLATED) TO THE LIMITED PARTNERS OF MIDWEST FARMLAND PARTNERS.

---

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement"document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0015

FURTHER, AFPC AGREES NOT TO CREATE OR INCLUDE (WHETHER CURRENTLY IN EXISTANCE OR CONTEMPLATED) ANY ADDITIONAL CORPORATIONS, PARTNERSHIPS, DIVISIONS, SPIN-OFFS, OR OTHER ENTITIES (WITHOUT INCLUDING THE SELLER OR GIVING THE SELLERS THEIR DUE CONSIDERATION) THAT WOULD SERVE TO DIMINISH THE SELLERS RIGHT TO PARTICIPATE FULLY IN AFPC AND ITS AFFILIATED PARTNERSHIP.

## AGREEMENT OF CONFIDENTIALITY

Except as AFPC may otherwise consent in writing, and, even then, solely for the benefit of AFPC, SELLERS shall keep confidential, and not, at any time, on and after first presentation of this BUY OUT AGREEMENT, disclose, or make any use of any trade secrets, confidential information, knowledge or other information as to the ASSETS. SELLERS shall not deliver, reproduce or, in any way, allow any such trade secrets, confidential information, knowledge or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of AFPC other than for the purpose of facilitating the sale of its Warrants.

## STAND STILL

Except as AFPC may otherwise consent in writing, SELLERS, and each of them, shall take no action with respect to the ASSETS, including cash, securities (all indicia of which shall be turned over to AFPC forthwith for cancellation or other disposition as AFPC shall deem appropriate to its purposes), whether in esse or potential, including, specifically, any possible remaining Cash Limited Partnership Interests outstanding and owned, in the possession, or controlled by any of the SELLERS, and any and all additional such Interests, and any underlying assets, or liabilities, all being subject to this BUY OUT AGREEMENT, including all advertising, whether personally, website or any other media.

## NON-COMPETE AGREEMENT

Except as Warrant holders or Shareholders of AFPC, and even so only as consistent with this BUY OUT AGREE-MENT and only as permitted by it, SELLERS shall not in any manner, directly or indirectly, including through entities controlled by SELLERS or otherwise, engage or participate in any business or activity described in the business plans, prospectuses, memoranda, or websites relating to the ASSETS (the "Business"), or otherwise perform services among themselves or for third parties which are currently competitive, or may at any time become competitive, with AFPC, or with respect to the Business, whether for SELLERS' own accounts or for that of another person, firm or corporation, or whether as stockholder, principal, partner, member, employee, agent, investor, proprietor, director, officer, employee or consultant, or in any other capacity.

---

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement"document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0016

The necessity of protection against competition by SELLERS and the nature and scope of such protection has been carefully considered and agreed upon by the parties hereto. SELLERS acknowledge that the Business will become highly competitive, that along with the ASSETS acquired by AFPC from SELLERS is goodwill with respect to the ASSETS, which SELLERS attempted to develop and maintain, and that AFPC, in BUYING OUT and entering into the transactions contemplated by the BUY OUT AGREEMENT, has relied on AFPC acquiring the goodwill, and upon SELLERS' commitments not to compete with AFPC or any current or future affiliate, assign or successor in the conduct of the Business. SELLERS and AFPC acknowledge and agree that the restrictions set forth in this Agreement are fair, reasonable and necessary and include the area in which the goodwill of the Business has been developed by SELLERS. SELLERS acknowledge that the consideration provided for herein is sufficient and adequate to compensate SELLERS for agreeing to the restrictions contained in this Agreement and that such restrictions will not cause SELLERS undue hardship. If, however, any court determines that the foregoing restrictions are unreasonable and for that reason unenforceable, such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable. SELLERS and AFPC agree that a monetary remedy for a breach of this BUY OUT AGREEMENT will be inadequate and will be impracticable and extremely difficult to prove, and further agree that such a breach would cause AFPC irreparable harm, and that AFPC shall be entitled to temporary and permanent injunctive relief as permitted by applicable law. SELLERS agree that AFPC shall be entitled to such injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bond or other undertaking in connection therewith. Any such requirement of bond or undertaking is hereby waived by SELLERS, and SELLERS acknowledges that in the absence of such a waiver, a bond or undertaking may be required by a court.

## NON-CURCUMVENTION AGREEMENT

SELLERS shall not, without the prior written consent of AFPC, which consent it may withhold in its sole discretion, utilize the FARMLAND CONCEPT(S), and even in the event of such consent, shall not utilize the FARMLAND CONCEPT(S), or any confidential information they may now possess with respect to the ASSETS, to circumvent or compete with AFPC in its business, anticipated and actual, based thereon, nor utilize any other information furnished or disclosed to SELLERS in anticipation or in consequence of this BUY OUT AGREEMENT, other than for the purpose of facilitating the sale of its Warrants.

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement" document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0017

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 9 of 56   Document 96

## CERTIFICATE OF FULL DISCLOSURE AS TO INVESTORS, FUNDS RECEIVED, FUNDS DISBURSED, AND ASSETS LOCATION

Exhibit A hereto contains the names and other necessary identity of all persons, entities or and others having an interest in MFLP or MFMC as INVESTORS, their addresses, all other means of communicating, such as phone numbers, and email addresses, their interest in each such entity, distinguishing the type of interest held, and how held, whether equity, debt, or other form of interest, and which form of each as to each, with all the terms thereof set forth as needed to permit AFPC to evaluate each interest (the "CLASS OF INTEREST"), including quantity of such interests, in number and value, allocated to each interest holder, cash or other form of value, indicating the basis of every value determination (the "NUMBER AND CASH VALUE OF INTERESTS HELD"), the consideration paid by each interest holders for the interests held (the "CONSIDERATION PAID"), and the entity or other person to whom such consideration was paid (the "RECIPIENT"). Further, the parties hereto agree to share any and all information necessary to ascertain an accurate disclosure of monies raised and spent.

In addition to Exhibit A, SELLERS shall also deliver all supporting evidence thereof, including readable paper copies of all evidences of ownership, or possession of such interests, including with respect to equity interests in corporate, partnership, and other entities, corporate share certificates, partnership interest certificates, or other entity indicia of such; and agreements, contracts, notes, options, security interests, warrants, and the like in the case of other equity and debt obligations of MFLP and MFMC.

## COVENANT NOT TO SUE AND TO ARBITRATE IN LIEU OF SUIT

The parties hereby covenant not to sue, nor cause anyone else to sue each other or AFPC (including its officers, directors, employees, agents, successors and assigns, and each reference to AFPC in this covenant shall include them) hereon or hereafter, nor to commence, participate in, or support, directly or indirectly in any way, any arbitration proceeding, suit, administration inquiry, action, or other proceeding, whether preliminary or otherwise, for any reason, or otherwise, whatsoever; except that SELLERS may commence an action to compel the issuance of the Warrants by AFPC, but no other form of action or proceeding, solely pursuant to the terms of this BUY OUT AGREEMENT, if in conformity and compliance with the Illinois Business Corporation Act, and relevant securities acts, being the Securities Act of 1933, the Securities Exchange Act of 1934, and the Illinois Securities Act of 1953, as each is in effect at the time of requested issuance, and if the SELLERS, having fully complied with all the terms necessary therefor, including tender of the exercise price in proper form, but not sooner than 30 days after AFPC declines in writing to effect such issuance, or 90 days after SELLERS have given notice of exercise, including tender, without written response from AFPC.

Any disputes between or among the Parties arising under or in consequence of this Buy Out Agreement shall be set forth in a writing identifying each dispute separately, specifying the estimated amount thereof, if known or

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement"document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

(4)

DRAFT 2 LFL 0018

determinable, and setting forth, in reasonable detail, the basis for each dispute (a "notice of dispute") so that the disputes may be resolved by negotiation between and among the parties within a period of 90 business days commencing the day after delivery of such writing to the affected parties. Reconciliation of such disputes by said negotiation shall be set forth in writing and said reconciliation shall be final, binding and conclusive on the parties to the disputes, and all other parties to this Buy Out Agreement unless objection thereto setting forth the same information required in a notice of dispute is lodged with the reconciling parties within ten days after notice of reconciliation thereof delivered to said other parties. If reconciliation by negotiation is not successful, a party to the disputes, or objector, may submit the items remaining in dispute for resolution to arbitration before a three arbitrator panel, one to be selected by each party to the dispute, and the third to be selected by those two, who shall arbitrate according to the rules of the American Arbitration Association. Such submission must be made within six months of the termination of negotiation, or objection, aforesaid, to preclude resolu- tion by return to status quo ante notice of dispute. The arbitration decision shall be in accordance with the relevant provisions of this Agreement and shall not award an amount more favorable to any party than the claims of such party as set forth in the notice of dispute. The fees and expenses of the arbitration shall be allocated equally among the parties to the dispute, or, if instituted by an objector, solely to such objector. As long as any decision is in keeping with the foregoing it shall be final, binding, conclusive, and enforceable in any court of law. Otherwise, the decision may be challenged in the Courts of Illinois, State or Federal, subject to the doctrine of forum non conveniens, by the aggrieved party, or objector, asserting such failure of the decision.

IN WITNESS WHEREOF, the parties have affixed their signatures hereto this date, being, September 23, 2010.
SELLERS:

ME KRUMDICK (EQUITY OWNER)

ODE DYER (NON-EQUITY CONCEPT RESEARCHER AND DEVELOPER)

In usa keeper Notary. Walworth ty
State - .... recorder
con muset En perm. 10-20-13

IN WITNESS WHEREOF, the parties have affixed their signatures hereto this date, being, September 25, 2010
BUYER:
Kendra K Szymanski
AMERICAN FARMLAND PARTNERSHIP CORPORATION
BY

NICHOLAS C. HINDMAN SR
CHIEF EXECUTIVE OFFICER

"OFFICIAL SEAL"
Kendra K Szymanski
Notary Public, State of Illinois
My Commission Expires 9/28/2013

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement" document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

(5)

DRAFT 2 LFL 0019

## TEN YEAR WARRANT TO PURCHASE COMMON SHARES

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURI-
TIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANS-
FERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING
THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN
EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS. THIS INSTRUMENT IS ISSUED SUB-
JECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A BUY OUT AGREEMENT
BETWEEN AMERICAN FARMLAND PARTNERS CORPORATION ("AFPC"), AS BUYER, AND THE SELLERS
REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED
BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH
SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL
BE VOID.

## WARRANT
### to purchase

## FOUR MILLION
## COMMON SHARES @ $1.00 (USD) per COMMON SHARE
### of

## AMERICAN FARMLAND PARTNERS CORPORATION
## ("AFPC")

### Issue Date: SEPTEMBER 25, 2010

This certifies that, for value received, AGRI-BUSINESS INVESTORS LIMITED PARTNERSHIP (the "Warrant-
holder") of

("address") ") is entitled, upon the terms and subject to the conditions hereinafter set forth, to acquire
from AFPC, in whole or in part, up to an aggregate of the number of fully paid and nonassessable
Common Shares set forth above, at a purchase price per Common Share equal to the Exercise Price set
forth above, both until adjusted pursuant to the provisions herein. The number of Common Shares (the
"Shares") and the Exercise Price are subject to adjustment as provided herein, and all references to
"Common Shares," "Shares" and "Exercise Price" herein shall be deemed to include any such adjustment
or series of adjustments.

The right to purchase the Shares represented by this Warrant is exercisable, in whole or in part by the
Warrantholder, at any time or from time to time after the execution and delivery of this Warrant by
AFPC on the date hereof, but in no event later than 5:00 p.m., Chicago time, on the fifth anniversary of
the Issue Date (the "Expiration Time"), by (A) the surrender of this Warrant and Notice of Exercise

This document is not complete without each of the following documents attached; the cover page, the table of contents page,
the "buy out agreement" document, the "warrant agreement" document, the "agreement as to buy-out agreement" page,
the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0020

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 12 of 56   Document 96

Exercise annexed hereto, duly completed and executed on behalf of the Warrantholder, at the principal executive office of AFPC (or such other office or agency of AFPC as it may designate by notice in writing to the Warrantholder at the address of the Warranthholder appearing on the books of AFPC), and (B) payment of the Exercise Price for the Shares thereby purchased by tendering in cash, by certified or cashier's check payable to the order of AFPC, or by wire transfer immediately available funds to an account designated by AFPC.

If the Warrantholder does not exercise this Warrant in its entirety, the Warrantholder will be entitled to receive from AFPC within a reasonable time, and in any event not exceeding ten business days, a new warrant in substantially identical form for the purchase of that number of Shares equal to the difference between the number of Shares subject to this Warrant and the number of Shares for which this Warrant is exercised.

Certificates for Shares issued upon exercise of this Warrant will be issued in such name or names as the Warrantholder may designate and will be delivered to such named Person or Persons within a reasonable time, not to exceed ten business days after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant. Any Shares issued upon the exercise of this Warrant will be duly and validly authorized and issued, fully paid and nonassessable and free from all taxes, liens and charges (other than liens or charges created by the Warrantholder, income and franchise taxes incurred in connection with the exercise of the Warrant or taxes in respect of any transfer occurring contemporaneously therewith). The Shares so issued will be deemed to have been issued to the Warrantholder as of the close of business on the date on which this Warrant and payment of the Exercise Price are delivered to AFPC in accordance with the terms of this Warrant, notwithstanding that the stock transfer books of AFPC may then be closed or certificates representing such Shares may not be actually delivered on such date. AFPC will at all times reserve and keep available, out of its authorized but unissued Common Shares, solely for the purpose of providing for the exercise of this Warrant, the aggregate number of Common Shares then issuable upon exercise of this Warrant at any time. AFPC will (A) procure, at its sole expense, the listing of the Shares issuable upon exercise of this Warrant at any time, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Shares are then listed or traded and (B) maintain such listings of such Shares at all times after issuance. AFPC will use reasonable best efforts to ensure that the Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Shares are listed or traded.

No fractional Shares or scrip representing fractional Shares shall be issued upon any exercise of this Warrant. In lieu of any fractional Share to which the Warrantholder would otherwise be entitled, the Warrantholder shall be entitled to receive a cash payment equal to the pro-rated Exercise Price for such fractional share.

This Warrant does not entitle the Warrantholder to any voting rights or other rights as a shareholder of AFPC prior to the date of exercise hereof. AFPC will at no time close its transfer books against transfer of this Warrant in any manner which interferes with the timely exercise of this Warrant.

Issuance of certificates for Shares to the Warrantholder upon the exercise of this Warrant shall be made without charge to the Warrantholder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificates, all of which taxes and expenses shall be paid by AFPC.

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement"document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0021

Case 2:19-cv-01319-PP    Filed 02/01/22    Page 13 of 56    Document 96

This Warrant is exchangeable, upon the surrender hereof by the Warrantholder to AFPC, for a new warrant or warrants of like tenor and representing the right to purchase the same aggregate number of Shares. AFPC shall maintain a registry showing the name and address of the Warrantholder as the registered holder of this Warrant.

This Warrant may be surrendered for exchange or exercise in accordance with its terms, at the executive office of AFPC, and AFPC shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

Upon receipt by AFPC of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and in the case of any such loss, theft or destruction, upon receipt of a bond, indemnity or security reasonably satisfactory to AFPC, or, in the case of any such mutilation, upon surrender and cancellation of this Warrant, AFPC shall make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same aggregate number of Shares as provided for in such lost, stolen, destroyed or mutilated Warrant.

If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a business day, then such action may be taken or such right may be exercised on the next succeeding day that is a business day.

The Exercise Price and the number of Shares issuable upon exercise of this Warrant shall be subject to adjustment from time to time as follows; provided, that if more than one of the following provisions is applicable to a single event, AFPC shall apply that provision that produces the largest adjustment and no single event shall cause an adjustment under more than one provision so as to result in duplication:

Stock Splits, Subdivisions, Reclassifications or Combinations. If AFPC shall (i) declare and pay a dividend or make a distribution on its Common Shares of Common Shares, (ii) subdivide or reclassify the outstanding Common Shares into a greater number of shares, or (iii) combine or reclassify the outstanding Common Shares into a smaller number of shares, the number of Shares issuable upon exercise of this Warrant at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be proportionately adjusted so that the Warrantholder after such date shall be entitled to purchase the number of Common Shares which such holder would have owned or been entitled to receive in respect of the Common Shares subject to this Warrant after such date had this Warrant been exercised immediately prior to such date. In such event, the Exercise Price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted to the number obtained by dividing (x) the product of (1) the number of Shares issuable upon the exercise of this Warrant before such adjustment and (2) the Exercise Price in effect immediately prior to the record or effective date, as the case may be, for the dividend, distribution, subdivision, combination or reclassification giving rise to this adjustment by (y) the new number of Shares issuable upon exercise of the Warrant determined pursuant to the immediately preceding sentence.

If any event occurs as to which none of the provisions of the immediately foregoing paragraph are strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board of Directors of AFPC, fairly and adequately protect the purchase rights of the Warrants in accordance with the essential

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement"document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0022

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 14 of 56   Document 96

intent and principles of such provisions, the Board of Directors shall make such adjustments in the application of such provisions, in accordance with such essential intent and principles, as shall be reasonably necessary, in the good faith opinion of the Board of Directors, to protect such purchase rights as aforesaid. The Exercise Price or the number of Shares into which this Warrant is exercisable shall not be adjusted in the event of a change in the par value of the Common Shares or a change in the jurisdiction of incorporation of AFPC.

Whenever the Exercise Price or the number of Shares into which this Warrant is exercisable shall be adjusted as provided herein, AFPC shall forthwith file at the executive office of AFPC a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Shares into which this Warrant shall be exercisable after such adjustment, and AFPC shall also cause a copy of such statement to be sent by mail, first class postage prepaid, to each Warrantholder at the address appearing in AFPC's records.

In the event that AFPC shall propose to take any action of any type described herein which would result in an adjustment in the Exercise Price or the number of Shares into which this Warrant is exercisable or a change in the type of securities or property to be delivered upon exercise of this Warrant, AFPC shall give notice to the Warrantholder, which notice shall specify the record date, if any, with respect to any such action and the approximate date on which such action is to take place. Such notice shall also set forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Exercise Price and the number, kind or class of shares or other securities or property which shall be deliverable upon exercise of this Warrant. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given at least 15 days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

As a condition precedent to taking any action which would require an adjustment as described herein, AFPC shall take any action which may be necessary, including debtholder, regulatory, or shareholder approvals, or exemptions, so that AFPC may thereafter validly and legally issue as fully paid and nonassessable all Common Shares that the Warrantholder is entitled to receive upon exercise of this Warrant successively whenever an event referred to herein shall occur. If an adjustment in Exercise Price made hereunder would reduce the Exercise Price to an amount below par value of the Common Shares, an appropriate adjustment shall be made to the Exercise Price to comply with the applicable provisions of the Corporate Law.

AFPC will not, by amendment of its Articles, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid, or seek to avoid, the observance or performance of any of the terms to be observed or performed hereunder by AFPC, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement" document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

DRAFT 2 LFL 0023

This Warrant will be governed by and construed in accordance with the federal law of the United States, if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State. Each of AFPC and the Warrantholder agrees (a) to submit to the exclusive jurisdiction and venue of the Circuit Court of the 18th Judicial Circuit, DuPage County, Illinois, for any civil action, suit or proceeding arising out of or relating to this Warrant or the transactions contemplated hereby, and (b) that notice may be served upon AFPC at its executive office, and upon the Warrantholder at the address for the Warrantholder set forth in the records maintained by AFPC. To the extent permitted by applicable law, each of AFPC and the Warrantholder hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to the Warrant or the transactions contemplated hereby or thereby.

This Warrant shall be binding upon any successors or assigns of AFPC.

This Warrant may be amended and the observance of any term of this Warrant may be waived only with the written consent of AFPC and the Warrantholder.

AFPC agrees that it will not take any action which would entitle the Warrantholder to an adjustment of the Exercise Price if the total number of Common Shares issuable after such action upon exercise of this Warrant, together with all Common Shares then outstanding and all Common Shares then issuable upon the exercise of all outstanding options, warrants, conversion and other rights, would exceed the total number of Common Shares then authorized by its Articles.

Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, by email, or by facsimile, upon confirmation of receipt; or (b) on the second business day following the date of dispatch if delivered by a recognized next day courier service. All notices hereunder shall be delivered according to instructions given upon execution of the Buy Out Agreement , or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

This Warrant, the forms attached hereto (the terms of which are incorporated by reference herein), and the Buy Out Agreement (including Exhibit A thereto), contain the entire agreement between the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or undertakings with respect thereto.

IN WITNESS WHEREOF, AFPC has caused this Warrant to be duly executed by a duly authorized officer.

Dated: September 25, 2010

AMERICAN FARMLAND PARTNERS CORPORATION

By: _____
NICHOLAS C. HINDMAN, SR.
CHIEF EXECUTIVE OFFICER

Suite 200
3333 Warrenville Road
Lisle, Illinois 69531

This document is not complete without each of the following documents attached; the cover page, the table of contents page, the "buy-out agreement" document, the "warrant agreement" document, the "agreement as to buy-out agreement" page, the "agreement not to sue" page and the American Farmland Partners Corporation Private Placement Memorandum.

(10)

DRAFT 2 LFL 0024

EXHIBIT

I km # 2
20 —
Copy

AGRI- BUSINESS GENERAL PARTNERSHIP ("ABGP"), and TODD A. DYER ("TAD") in consideration of $25,000, receipt of which by TAD is hereby acknowledged by TAD, the parties hereto confirm and agree that:

1. TAD has not had and shall not have any managerial control over, or equity interest in ABGP hereafter; nor has TAD had any equity, managerial, or other interest in AFPC or any partnership of which AFPC is or has been a general partner, including MIDWEST FARMLAND LIMITED PARTNERSHIP and AMERICAN FARMLAND LIMITED PARTNERSHIP, since the BUYOUT AGREEMENT of 9/23/2010, among MARK BORST, MEL KRUMDICK, AND TODD DYER, as sellers and AFPC, as buyer, dated 9/23/2010, and modified 9/30/2010, designating ABGP as the recipient of the Warrant which constituted consideration for the buyout.

2. TAD shall not have nor directly or indirectly maintain any presence on the Internet in the name of, or on the behalf of, including any of the following, which shall be shut down within 30 days: www.midwestfarlandpartners.com and www.midestfarmlandpartners2.com

3. TAD shall amend his linkedin and any other profiles to delete any references to Midwest Farmland Limited Partnership and American Farmland Partnership Corporation

4. TAD shall make no press releases, whether on the Internet specifically regarding American Farmland Partners, Midwest Farmland Partners or Nicholas C. Hindman.

5. TAD shall be removed from all ABGP bank accounts, including the extant account at Community Bank in Lake Geneva, Wisconsin, as to which he has a debit card, and

6. There shall be no sales of AFPC Warrants owned by ABGP by any of the parties hereto without the prior written concurrence of majority share holder.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures this 22nd day of December, 2011.

_____
TODD A. DYER

AGRI-BUSINESS GENERAL PARTNERSHIP

By: _____
MARK BORST, MANAGING GENERAL PARTNER

I hereby certify that Todd A. Dyer appeared before me this date and signed this document in my presence.

_____
Notary Public
NOTARY SEAL

12/22/11 Lake Geneva WI

EXHIBIT
# 3

AGRI- BUSINESS ███████ PARTNERSHIP ("ABGP"), and ███████████████
consideration of $25,000, the parties hereto confirm and agree that:

1. Melvin Krumdick has not had and shall not have any managerial control over, or equity interest in ABGP hereafter, nor has Melvin Krumdick had any equity, managerial, or other interest in AFPC or any partnership of which AFPC is or has been a general partner, including MIDWEST FARMLAND LIMITED PARTNERSHIP and AMERICAN FARMLAND LIMITED PARTNERSHIP, since the BUYOUT AGREEMENT of 9/23/2010, among MARK BORST, MEL KRUMDICK, AND TODD DYER, as sellers and AFPC, as buyer, dated 9/23/2010, and modified 9/30/2010, designating ABGP as the recipient of the Warrant which constituted consideration for the buyout.

2. Melvin Krumdick shall not have nor directly or indirectly maintain any presence on the Internet in the name of, or on the behalf of, including any of the following, which shall be shut down within 30 days: www.midwestfarlandpartners.com and www.midestfarmlandpartners2.com

3. Melvin Krumdick shall amend his linkedin and any other profiles to delete any references to Midwest Farmland Limited Partnership and American Farmland Partnership Corporation

4. Melvin Krumdick shall make no press releases, whether on the Internet specifically regarding American Farmland Partners, Midwest Farmland Partners or Nicholas C. Hindman.

5. Melvin Krumdick shall be removed from all ABGP bank accounts, including the extant account at Community Bank in Lake Geneva, Wisconsin, as to which he has a debit card, and

6. There shall be no sales of AFPC Warrants owned by ABGP by any of the parties hereto without the prior written concurrence of majority share holder.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures this ████████
████████████

_Mel Krumdick_
**MELVIN KRUMDICK**

I hereby certify that Melvin Krumdick appeared before me this date and signed this document in my presence.

**AGRI-BUSINESS GENERAL PARTNERSHIP**

By: _____
**MARK BORST, MANAGING GENERAL PARTNER**

Notary Public Rod Avis
Notary Public, State of Illinois
My Commission Expires Aug. 6, 20__

BN: LFL 0203



## M Gmail

**(no subject)**
1 message

**Nicholas Hindman** <n.hind@sbcglobal.net>                                                                Wed, Jul 27, 2011 at 10:10 AM
To: Todd Dyer <todd@farmlandmarketinggroup.com>, Tracy Boulin <tracy@farmlandmarketinggroup.com>, Nicholas Hindman <nhind@americanfarmlandpartners.com>
Cc: George Hook <NameGen@aol.com>

Todd & Tracy:

Attached are some of the documents we discussed yesterday.

Things went Ok with Phan, she is converted, but she needs to liquidate her stock soon to pay back her loan. We need to help her do that, hopefully later this year when things are rolling.

I spoke with Rick Hesler.

George, please take a look at the Agri-Business Partnership agreement to see if it needs to be revised before Mark and Mel sign. We also need to prepare and amendment to the Buyout and Warrant Agreements to reflect the proper partnership name.

Note my new email address above, please use that to email me going forward.

Thanks

Nick

---

**3 attachments**

**Agri-Business Investors General Partnership.doc**
34K

**Phan Doan MFLP Certificate.pdf**
2570K

**Hyatt Bangert Documentation.pdf**
8760K

EXHIBIT #4

EXHIBIT #5

**A**
**AGRI-BUSINESS INVESTORS GENERAL PARTNERSHIP**
**(the "Partnership")**
**AGREEMENT**

As managing general partners of the Partnership, Mark Borst and Mel Krumdick do hereby enter into general partnership upon the terms expressed herein with those persons whose names to be set forth in Exhibit A hereto and designated general partners for the purpose of acquiring interests in farmland management corporations, farmland limited partnerships, and such other farmland and other investment opportunities as a majority in interest of the general partners shall approve (the "Investments"), supporting the Investments to the extent of the capital contributed and interest earned thereon by providing funds for acquisition and expenses, and doing all those things necessary and appropriate to the accomplishment of said purposes of the Partnership.

The managing general partners shall manage the Partnership and its affairs consistent with the purposes of the Partnership and in the best interests of the general partners, including the exclusive right to execute all documents on behalf of the Partnership, unless an additional partner shall have been designated by vote of holders of at least a majority of the Partnership interest, excluding the Partnership interest held by the managing general partners, to sign such documents for which an additional signature is required as determined by such vote.

The Partnership shall terminate on the earlier to occur of (1) final disposition of all the Investments, which shall include distribution of the Investments to the general partners as provided by this Agreement of General Partnership, (2) vote of the partners other than the managing partners having a partnership interest of at least 75% of the total partnership interest exclusive of the partnership interest of the managing general partner terminating the Partnership, and (3) December 30, 2020, or such earlier date as partners, other than the managing general partner, having at least 85% of the total partnership interest exclusive of the partnership interest of the managing general partner determine, but not earlier than 2015.

<u>There shall be up to 10,000 Partnership interests of an initial value of $1,000 each.</u>

Partnership interests shall be freely transferable as general partnership interests to other extant general partners, and to individuals and other persons, subject to the prior written

Page 1 of 4

approval of the managing general partners who shall not withhold
their approval except to assure adequate identification, appro-
priate disclosure, compliance with applicable laws, and other
conditions stated by the managing general partners in connection
with each proposed transfer that may not be unreasonable. Part-
nership interests shall be transferable otherwise only in the
sole discretion of the managing general partners.

The Partnership shall have and maintain its chief executive
office in Illinois at an address to be designated from time to
time by the managing general partner.

The Partnership property shall consist of the funds contrib-
uted to the partnership by the partners listed in Exhibit A he-
reto, and the Investments, including all accruals thereto in
whatever form.

It is the intention that the Partnership Investments shall
consist entirely of common stock, limited partnership interests
and other indicia of ownership in such form as shall avoid any
personal liability by the Partnership and its partners.  However,
the Partnership may own real estate, motor vehicles, equipment or
machinery, and other property that may be reasonably expected in
ordinary course to cause the Partnership to incur liability if
insurance in an amount sufficient to protect the Partnership and
its partners from any and all liabilities attributable thereto is
obtained and maintained therefor. Any partner who causes such
property to be acquired by the Partnership or to be used by the
Partnership shall be deemed to have consented thereby to person-
ally hold harmless and indemnify the Partnership and each other
partner for any liability confirmed against the Partnership or
other partner and any fees and expenses of defense as a result of
such ownership or use. Apart from the foregoing and except for
any liability incurred by another partner on behalf of the Part-
nership without the consent of the managing general partner, the
managing general partner shall be the sole general partner liable
for the obligations of the Partnership in excess of the capital
of the Partnership except to the extent that any other partner
consents to being personally liable therefor.  Any other partner
than the managing general partners who incur liability on behalf
of the Partnership shall be personally liable to the exclusion of
all other partners, including the managing general partners, and
deemed to have consented thereby to hold harmless and indemnify
the Partnership and each partner for any liability confirmed
against the Partnership and for any fees and expenses of defense
as a result thereof.  Anyone other than the managing general
partners who represents to another not a partners that he is au-

Page 2 of 4

DRAFT 2 LFL 0170

thorized to act on behalf of the Partnership shall be liable to the Partnership and to the other partners therefor and shall, in addition, incur an obligation to pay the Partnership an amount in the nature of liquidated damages equal to 15% of any damages as estimated by the partners acting by majority in interest, excluding the Partnership interest of the managing general partner, or as established by arbitration, judgment of court or other independent third party proceeding as the said majority in interest shall determine, payable immediately upon first determination. Nothing herein shall be construed to grant authority to anyone other than the managing general partner to conduct the affairs of the Partnership, to incur any obligations on behalf of the Partnership or to engage in any activities, or cause anyone else to engage in any activities, on behalf of the Partnership and no such authority is hereby granted.

No merger, consolidation or conversion of the Partnership shall occur unless partners holding 85% of the partnership interest shall have consented specifically thereto.

To the extent this Partnership agreement does not otherwise provide, the Illinois Uniform General Partnership Act [805 ILCS 206] shall govern relations among the partners and between the partners and the Partnership.

Although the managing general partner should endeavour to invest funds of the Partnership short term pending their use for the purposes of the Partnership, his not doing so nor the imprudence of any such investment shall not constitute a violation of this Partnership Agreement or a breach of any duty, statutory or otherwise, that he might have in the absence of this exonerating clause unless such investment activity is manifestly unreasonable.

As to the managing general partners, a majority in interest of the Partnership interest, excluding the interest of the managing general partners, and as to any other partner, the managing general partners plus 25% in interest of the Partnership interest, excluding the interest of the managing general partners, may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate a partner's fiduciaries duties.

Although the partners shall act in good faith and fairness toward each other in all matters relating to the Partnership, there shall be a presumption that all acts taken by a partner meet such obligation and the burden shall be on any person as-

DRAFT 2 LFL 0171

serting the contrary to prove it beyond a reasonable doubt in effect upon the Partnership and each and every partner before any recovery therefor may be had by the Partnership, any partner, or any person asserting said contrary.

Except as otherwise provided herein, the provisions of the Illinois Uniform General Partnership Act [805 ILCS 206] shall govern this Partnership.

Mark Borst
Managing General Partner

Mel Krumdick
Managing General Partner

**EXHIBIT A**

NAME                                    INTERESTS

Mark Borst                                 1001
Mel Krumdick                               201

Page 4 of 4

DRAFT 2 LFL 0172

EXHIBIT
# 6

**Subject:** Agri-Business Investors Partnership
**From:** Nicholas Hindman <n.hind@sbcglobal.net>
**Date:** 12/19/2011, 6:19 PM
**To:** Todd Dyer <todd@farmlandmarketinggroup.com>
**CC:** George Hook <NameGen@aol.com>, Mark Borst <markborst3@hotmail.com>, Mel Krumdick <Frmelk@aol.com>

Todd:

As we discussed today, George Hook is in the process of preparing some
Agri-Business Investors documents  and an amendment to the Buyout agreement showing Agri-Business Investors as a general partnership instead of a limited partnership.

If we are going move foward on this potential large investment, we need to have accurate documentation.

I believe the amendment will require all of our signatures, but George will advise.

Nick

DRAFT 2 LFL 0216

*EXHIBIT*
*# 7*

**Subject:** Fw: FOR YOUR REVIEW AND COMMENT
**From:** Nicholas Hindman <n.hind@sbcglobal.net>
**Date:** 12/20/2011 12:04 PM
**To:** Todd Dyer <todd@farmlandmarketinggroup.com>

— Attachments: —————————————————————————————————————————————

| CONFIRMATION - NCH edits.doc | 23.0 KB |
|---|---|
| REDESIGNATION - NCH edits.doc | 24.0 KB |

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 25 of 56   Document 96

# CONFIRMATION

THIS IS CONFIRMATION to _____
by the undersigned that TODD A. DYER ("TAD") does not have any managerial
control over, or equity interest in AMERICAN FARMLAND PARTNERSHIP
CORPORATION ("AFPC"), MIDWEST FARMLAND LIMITED PARTNERSHIP
("AFLP"), or AGRI-BUSINESS GENERAL PARTNERSHIP ("ABGP"), as of the
date hereof, and, that in consideration of the purchase of _____
WARRANTS of AFPC owned by ABGP from ABGP, ABGP does hereby agree that
TAD shall have no such managerial control over, or equity interest in ABGP
hereafter, and that in consideration of the conversion of such _____
WARRANTS into COMMON SHARES OF AFPC, AFPC does hereby agree that
TAD shall have no such managerial control over, or equity interest in AFPC or
AFLP thereafter.

IN WITNESS HEREOF, the undersigned affix their signatures hereto this __ day of
December 2011.

AMERICAN FARMLAND PARTNERSHIP CORPORATION


BY: _____

      NICHOLAS C. HINDMAN, SR., CEO

MIDWEST FARMLAND LIMITED PARTNERSHIP

BY: MIDWEST FARMLAND LIMITED PARTNERSHIP

THE GENERAL PARTNER

BY: _____

      NICHOLAS C. HINDMAN, CEO


AGRI-BUSINESS GENERAL PARTNERSHIP

BY: _____

      MARK BORST

AND

BY: _____

      MEL KRUMDICK

THE MANAGING GENERAL PARTNERS

BN: LFL 0220

**TODD A. DYER**

DRAFT 2 LFL 0221

# REDESIGNATION

WHEREAS, MARK BORST, MEL KRUMDICK , AND TODD DYER, designated as SELLERS in that certain BUYOUT AGREEMENT among them and AMERICAN FARMLAND PARTNERSHIP CORPORATION, dated 9/23/2010, designated AGRI-BUSINESS INVESTORS LIMITED PATNERSHIP  as the recipient of the Warrant; and WHEREAS, said limited partnership entity was never formed,

NOW THEREFORE, said SELLERS do hereby redesignate AGRI-BUSINESS GENERAL PARTNERSHIP as the recipient of said WARRANT and AMERICAN FARMLAND PARTNERSHIP CORPORATION, the other party to said BUYOUT AGREEMENT does hereby agree also thereto, and agrees to reissue a WARRANT in the name of AGRI-BUSINESS GENERAL PARTNERSHIP therefor upon return of the original WARRANT.

IN WITNESS WHEREOF THE UNDERSIGNED HAVE SET THEIR SIGNATURES AS OF 9/30/2010 AS FOLLOWS:


_____          _____
MARK BORST                         MEL KRUMDICK


_____          AMERICAN FARMLAND  PARTNERSHIP
TODD DYER                          CORPORATION

                                   BY:_____
                                        NICHOLAS C. HINDMAN, SR.

BN: LFL  0222

█████ █████ ████hg █ █ ███ ██d █ ██████ ███d ████ ██.2 ████ █. ███ ██r
█████ █████████ ████ ███████d █████ ██N ████ ██g █████ █████ ██████ ████t
███v █h ███/ ███d ████h ████████s ██████ █ ████ █████.

█████ █████ █████hg █████ ██d █ ███h █████ ███h █████ ███en ████ ██N,
████', ████, █, ███ █, ████ ███, █████b ████ █g ███ ██████t
████████. ██T █████ ██████ ████████████ ████ ██████ ██████ ███████
█████g █████ ██e █████ ██s ██████ ████ ████ ██████ ██e ███████████
█████b ████ ███████d █ ████ ██████T █████ ██ ██████ ████ █Y
██N █████ ████████████ ███ ███ ██ ███.

█████ █████ ████s ██████ █████████ ████ ████████ ████, █████g ██ █
████s █████, ██████, ███████t ██ █████████ █████ ████t ██████
██, █████████ ██████ ████████████ ████t ██ ████ ███████
██T ████r ████ ███s █ █████████. ████ ██████ █████nt
██d ████ ██████h ████████s ██ █s █████.

██████T ██████ █████W ████████.y ██████████ █████ ████ ██g ██ █h
████.y ██R ███████ ████████ ████ ██████ ██ ██████R ████s
████.y █████ ██e ████ ██████ ██████ ██████ ██████ ██████s
████ ██, ██T ████ ████d ████████y ██████0 ████ ████████.
██T █████ ████d █ ███h ████/ ██████ ████W ███████t.

██████ █████r █████k █████s █████ ████ ██l ██████s █████g █████h
█████s █████ts ████ ████████ █████s █████d ████s
███ ██████ ██d █ ███n. █████. ██████ ████████s ████e ██████
██████████ ████ █████l █████. ████ █████████ █████████████
█████████d ██ ███. ██R ████ ██0 █████ ██0 ██████████r ████s
█████████e █████ █████E ██ █████p █████k ██████████

Sometime in late 2010 or early 2011, BORST received at least two
unsolicited telephone calls from someone who claimed to be interested in
purchasing Agri-Business. The caller, who spoke with an Indian accent, did
not identify himself and was evasive when asked his identity. The caller
stipulated that he would not make a formal offer until DYER's and
KRUMDICK's associations with the business were terminated.

BORST responded by negotiating the purchase of DYER's and KRUMDICK's shares
for $25,000 each. BORST paid for their shares with cashier's checks drawn
on BORST's account at First Banking Center. DYER and KRUMDICK secretly
agreed to return the purchase funds to BORST at a later time.

██████T ██; ██████████.y █████████d ██r ████N █████ ████████s ██████g █████CK ██████

BN: LFL 0206

EXHIBIT
# 9



AMERICAN FARMLAND PARTNERS

To: Investors in American Farmland Partners
From: American Farmland Partners' Board of Directors
Re: American Farmland Partners response to Dyer
Letter and Press Release
Date: February 19, 2012

One of our Investors provided Nick Hindman with a copy of the letter and press release sent by Todd Dyer, styling himself President of Farmland Marketing Group. Upon inquiry, Nick determined that not all of our Investors had received this communication, most notably, Mark Borst, the largest warrant holder and the investor with the most cash invested in the farm venture. While Dyer was hatching his exchange scheme, Mark, Nick and George Hook were meeting at Mark's office last Thursday, February 16, discussing their plans to put the farming venture back on track after Dyer's departure. Mark is committed to American Farmland Partners and will not be tendering his warrants to Dyer.

Todd Dyer's letter and press release contain materially false statements. His exchange offer is a fraud piece designed to extract more money for him. In presenting his letter and exchange offer, Todd Dyer must be assuming that you are unsophisticated investors since no one other than the least sophisticated would give it any credence.

His press release deserves no more comment other than that it describes an impossible procedure for exchange, contemplating that you will rush to meet an artificial deadline to tender your equity in the farming venture and a check for $25,000 without ever seeing the offer memorandum so that you can have an option to convert into an unworkable entity controlled by a convicted felon.

We are confident that none of our Investors are unsophisticated. Therefore, we are confident that none of them would fall prey to Dyer's scheme. Todd Dyer must know that too. So what is Todd Dyer's real purpose? Rest assured that it has nothing to do with any attempt to benefit you. That is not his nature. Blind greed? Retaliation for his being shunned? The desire to make trouble? These are all more likely.

6070 S. ROUTE 53, SUITE B    LISLE, IL 60532    877-955-7005    FAX 630-395-9785
WWW.AMERICANFARMLANDPARTNERS.COM

Point by point, here are our responses to the false assertions of Todd Dyer's letter.

Todd Dyer falsely asserts that he, Melvin Krumdick, and Mark Borst founded Midwest Farmland Partners as a consolidation of independent grain farmers located in the Midwest.

In fact, the Midwest Farmland Limited Partnership was created by George Hook, who brought in Nick as the chief financial and operating officer to counterbalance any of Todd's remaining proclivities for securities fraud, for which he was convicted and served federal prison time. Todd had agreed to this as a pre-condition to George agreeing to structure and otherwise implement Todd's germinal farmland concept, which would have remained just that without structure designed by George.

Acquiring farms in the unique way conceived by George was a part of the implementation of the concept. However, Todd was never able to obtain sufficient confidence of any farmers to result in any consolidation of farmers, let alone acquire any farms. Therefore his statement about consolidation is materially false. Likewise, his assertion that he and Mel Krumdick paid the majority of start-up expenses is false. All of those start up expenses were paid with funds invested by Mark Borst.

Todd Dyer asserts that "there were repeated concerns by the growers interviewed that financial people, in control of the company, might ultimately sell off, for profit, without the farmers [sic] consent, all of the arable land that would likely accumulate in the Fund [sic]." If there were any such concerns, they were never conveyed beyond Todd.

The view expressed by Trent Griffith, a successful farmer from around Rock Island, a Monsanto sales executive with extensive access to farmers, and President of AFPC for the short time before Dyer drove him away, was that control of AFPC by the farmers was neither advisable, nor necessary to attracting them to the venture. Furthermore, there could be no legitimate cause for such concern among the farmers because the "financial people" were confined by George's structuring to a cash limited partner position, the farmers had control of their farms via their farmland limited partnership interests, each farmer could control the disposition of his own farm by virtue of series farmland limited partnership interests specific to him, and the general partner was precluded via fiduciary and partnership provisions

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 31 of 56   Document 96

from effecting any sale of farmland without the specific consent of the farmers, and, in the case of each farm, the series holders. Accordingly, Dyer's assertions are necessarily materially false because the structuring did not permit the concerns to materialize. If there were such concerns expressed, they would have been easily assuaged by referring to the materials that George had prepared to explain the venture's structure to the cash and farmland investors.

Todd Dyer's statement that "a new entity would be created by farmer/agri business owner to buy-out the founder of Midwest Farmland Partners to ensure farmers and people from within agriculture controlled the Fund" is materially false. The reason that the new entity, American Farmland Partners, was created was to distance the worthy concept from the stench that Todd Dyer had given Midwest Farmland Partners by his false statements, false promises, and diversions of funds received from Investors intended for the partnership, but diverted to his own personal use.

Todd Dyer's statement that Agri-Business Investors Partnership ("ABIP") owned "a number of agriculturally based businesses" needs verification. Mark Borst, who bought Dyer and Krumdick out of ABIP recently, is not aware that ABIP had any such other businesses. To his knowledge, its only asset was the Warrants issued by American Farmland Partners Corporation primarily to get rid of Todd Dyer as required by Trent Griffith, and his associates Philip Jordan, like Trent a successful Western Illinois farmer, and Charles Rea, a Monsanto sales person with extensive access to farmers, so to proceed as officers and directors of AFPC with the farmland venture without Dyer's taint, which was clouding relationships with farmers and investors.

The condition of the Buy-Out Agreement that there be an IPO by a date certain was substantially thwarted by Dyer's own conduct in the course of his offering and selling MFLP partnership interests owned by Midwest Farmland Acquisition Corporation, an enterprise controlled by him and Krumdick. Indeed, one specific sale of partnership interests, owned by Dyer's controlled MFAC, premised on Dyer's misrepresentations resulted in fraud complaints being filed with the Illinois and Wisconsin Securities Departments and the institution of a proceeding in Illinois, which has been ongoing since August 2010 and has severely limited the progress of our farmland venture up to now. These proceedings are why AFPC's web site has been voluntarily, but

temporarily, taken down. Nick is in the process of extracting AFPC from these proceedings. We know that the authorities in Iowa will soon learn of Dyer's new venture organized in their state and we trust they will take appropriate action.

The reasons for Todd Dyer's apparently fraudulent conduct were two-fold; first to obtain funds for himself and second to precipitate the circumstance which would require AFPC to have to issue an additional 1,500,000 Warrants to ABIP, which Todd Dyer could then purloin for his personal purposes. Even though Todd Dyer was not actually an ABIP partner, he had controlled its operations.

Todd Dyer's assertion that ABIP created a marketing organization to promote AFP at their own expense and to ensure its success is rendered false, whatever the intent at creation, by its conduct, and misleading statements, resulting in Investor funds going to Todd Dyer instead of AFPC. There is no marketing organization, just Todd and Tracy, an admin who has not been paid in some time. Since Todd used AFPC's address without permission, Nick has received numerous past due invoices to Farmland Marketing Group from the PR services used by Todd to send out his nefarious, sometimes outrageous press releases with ridiculous and inaccurate claims. Todd also has yet to pay almost $50K in radio advertising now nearing two years past due. Copies of these past due notices can be supplied to any investor that is interested.

This and other numerous assertions that Todd Dyer had a continuing role with the farmland venture caused extreme damage to the farmland venture. There is mention of his pseudo-involvement through the fraud piece which is his letter to Investors and press release. The links in his letter provide ample proof of this.

An AFPC IPO "did not materialize as hoped," but not for the reasons that Todd Dyer asserts in his fraud piece letter. It was sabotaged by Todd Dyer, so that he could latch unto additional Warrants for sale. Another reason the IPO did not materialize was that he repeatedly threatened to sue Trent Griffith, Philip Jordan, and Charles Rea, who were designated to become the farm oriented officers and directors, so that they declined to participate until Dyer was totally removed from the scene. After that occurred as a result of the September, 2010 Buy-Out, Todd Dyer resurfaced in violation of the Buy-Out Agreement and falsely asserted that he continued to have a controlling interest in the marketing, investor relations, and farmland

acquisitions, which caused these key individuals to again to decline to participate in any capacity in the farmland venture, even though they had made substantial equity investments.

An example of the further damage Todd Dyer caused is his unilateral, unauthorized commitment that AFPC would attend an NG Endowments meeting putatively with the Chief Investment Officers of University Endowment Trusts, at a cost of $80,000. Todd contracted for the NG conference in the name of Farmland Marketing Group and now NG is threatening suit against Todd's entity for non-payment. Nick received the correspondence regarding this matter at the AFPC address and can provide copies upon request. Nevertheless, Dyer's fraudulent letter to you falsely asserts a beneficial relationship with NG.

All of Todd Dyer's assertions about farmer dilution are falsely delusional. The structure which he complains causes that actually precludes it as explained hereinabove. The farmers' and specific farmers' farm interests are secure. The only significant dilution would occur solely by voluntary action of the farmer to convert farmland partnership interests into AFPC Common Shares for the purpose of participating in the contemplated public market that would be created by AFPC becoming a public company. Presumably, a farmer would elect to do that only if he wanted more immediate liquidity than his partnership interest might provide. Hence, there is no fatal flaw in the current structure.

However, the Iowa Fund that Todd Dyer proposes is fatally flawed, as it would convert the farmers' farms into assets of a corporation of which they would be shareholders so that they would lose control of their specific farm, they would be confined to receiving their farmland income as dividends which would be double taxed to them as such income after the corporation was taxed as well. Their investment would be lumped with and become indistinguishable from the cash investors' investment, thereby putting them at the very mercy of the very "financial people" that is basis for Todd Dyer's wildly false assertion that the current farmland venture structure is fatally flawed.

Clearly, truth and reason are no obstacles to Todd Dyer asserting whatever will achieve his unholy goal of defrauding others of their money and diverting investment in the farmland venture to his own pocket.

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 34 of 56   Document 96

A recent incident provides ample proof. Mentioned above was Mark Borst's recent buyout of Dyer and Krumdick. This was not Mark's voluntary act, as buying them out for $50,000 was a requirement of an investment group who indicated that they intended to make a significant investment in AFPC through the acquisition of ABIP's Warrants and their conversion to Common Shares. This group's mysterious spokesman would speak only to Mark, as the major equity (albeit indirect via his Warrants) owner of AFPC, and only by phone calls initiated by this mystery man, whose initial contact had been Dyer, according to Todd Dyer. Turns out there was no such investment group intent on investing. After Mark paid out the $50,000 to Dyer and Krumdick, this mysterious spokesperson disappeared and the touted meeting with the investment group which was to result in a multi-million dollar investment did not take place. What else could this have been than another of Dyer's fraudulent schemes? It just so happened that Dyer formed his new Iowa entity within days of receiving this cash from Borst under these false pretenses.

Todd Dyer falsely asserts that Nick is not currently a Certified Public Accountant. In fact Nick is a CPA, just not licensed currently by Illinois. He is a member in good standing with the American Institute of Certified Public Accountants and the Illinois CPA society. Any investor wishing to see evidence of this will be provided the membership information. The primary reason for having a State CPA license is to perform financial statement audits in the public accounting arena; Nick does not perform financial statement audits. Nick is like many accountants who function as financial officers of corporations and it is not necessary during such tenure to maintain a State license that would permit him to perform audits for accounting clients. Nick served as a CFO of a NASDAQ company, Westell Technologies, Inc., for eight years and there was never an issue that he did not have a CPA license. In all the filings made with the SEC, Nick was noted as a CPA.

So this assertion about Nick is just one more misleading statement among the many that Todd Dyer employs to extract money fraudulently from whoever will listen.

Clearly, the exchange described by Todd Dyer is nothing more than a fraudulent scheme, blatant albeit, to obtain $25,000 for a "one time option" to convert all Investor equity in the farmland venture into a useless Iowa shell which will be controlled by a convicted con artist

who has and continues to demonstrate that he is an unrepentant recidivist.

Clearly, all Investors in the farmland venture who do not want to lose their current investment and also the $25,000 that Dyer is attempting to cadge from them should steer clear of Todd Dyer and his fraudulent schemes.

Todd Dyer has been dispatched from the farmland venture for good reason. His ultimate and final exclusion should bring back the farm oriented officers that he scared away. The "financial people" that Todd Dyer denigrates should renew their interest.

We wanted to rebut Todd Dyer's false statements and expose his fraudulent schemes which we believe were launched primarily to interfere with the Plan for Going Forward that we are developing to repair the damage that Todd Dyer has caused so to get the farmland venture back on its track and eventual prosperity. Once again, we were side-tracked by Todd Dyer's lies and fraudulent schemes, but this time only briefly to rebut him, as we will be able to present our Plan for Going Forward to all the Investors very soon.

In addition to all of the foregoing, but probably not as significant or of great concern to the Investors, Todd Dyer's letter to the Investors and his exchange offer violate the terms of the Buy-Out Agreement applicable to him.

We commit to better communications in the future. Without the constant distractions, problems and strife caused by Todd Dyer during the past two years, this commitment will be easier to keep. We WILL move forward in 2012.

For the Board,

Nicholas C. Hindman, Sr.
Chairman of the Board

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 36 of 56   Document 96

EXHIBIT
# 10

WM0015

## Rick Hesler

**From:** "Nicholas Hindman" <n.hind@sbcglobal.net>
**Date:** Tuesday, May 01, 2012 9:07 PM
**To:** "Todd Dyer" <todd@farmlandmarketinggroup.com>; "Arun Subramanian"
<arun_subs@hotmail.com>; "Andrew Greenberg" <greenberg@sprynet.com>; "Renate Muller"
<renate.muller@att.net>; "frank imparato" <fimp9@yahoo.com>; "Trent Griffith"
<rtgriffith4@gmail.com>; "Phillip P, Jordan" <phil.jordan728@gmail.com>; "Charles Rea"
<brodcoinc@yahoo.com>; "George Vander Vennet" <g5155@ameritech.net>; "Katherin Biddle
Austin" <KBAustin37@gmail.com>; "mark borst" <markborst3@hotmail.com>; <Frmelk@aol.com>;
"James A. Dyer" <jdyerffr@genevaonline.com>; "Michael DiNapoli" <michael.dinapoli@gmail.com>;
"Patrick Walls" <paddy5200@aol.com>; "Robert Woolfolk" <woolfolk@princeton.edu>; "David Gee"
<DGeeWXGI@aol.com>; "Richard Hesler" <rhesler@wi.rr.com>; "Anthony Gallo"
<anthony@amgcap.com>; "Sonia Lal" <sonialal14@gmail.com>; "James Walter"
<jswalter@suddenlink.net>.
**Attach:** ATT00109.jpg
**Subject:** Re: American Farmland Partners Financial Disclosure To Investors

To Todd Dyer:

Since neither you nor any of your conduit entities are investors in American
Farmland Partners, you will not be provided any information.

Direct investors in American Farmland Partners can make what ever inquiry for
information they want individually, and they know how to contact me.
We have cooperated with the Illinois Securities Department and have provided them a
complete accounting of all funds that were invested directly in American Farmland
Partners. We can't account for funds that were directed into your conduit entities.

Any further correspondence or requests from you will not be acted upon.

American Farmland Partners is anxious and prepared to resume activities once the
Illinois Securities Department inquiry is concluded.


^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^
Nicholas C. Hindman, Sr.

American Farmland Partners ●  877-955-7005
6070 State Route 53, Suite B, Lisle, IL 60532 ● n.hind@sbcglobal.net

---

This message may contain privileged or confidential information. If you are not the
intended recipient of this message, you may not make any use of, or rely in any way
on, this information, and you should destroy this message and notify the sender by
reply email.

---

**From:** Todd Dyer <todd@farmlandmarketinggroup.com>
**To:** Nicholas Hindman <n.hind@sbcglobal.net>; Arun Subramanian <arun_subs@hotmail.com>; Andrew
Greenberg <greenberg@sprynet.com>; Barry Thomas <bythenbrs@aol.com>; Renate Muller

7/22/2012

<renate.muller@att.net>; frank imparato <fimp9@yahoo.com>; Trent Griffith <rtgriffith4@gmail.com>; Phillip P.
Jordan <phil.jordan728@gmail.com>; Charles Rea <brodcoinc@yahoo.com>; George Vander Vennet
<g5155@ameritech.net>; Katherin Biddle Austin <KBAustin37@gmail.com>; mark borst
<markborst3@hotmail.com>; Frmelk@aol.com; James A. Dyer <jdyerffr@genevaonline.com>; Michael DiNapoli
<michael.dinapoli@gmail.com>; Patrick Walls <paddy5200@aol.com>; Robert Woolfolk
<woolfolk@princeton.edu>; David Gee <DGeeWXGI@aol.com>; Richard Hesler <rhesler@wi.rr.com>; Anthony
Gallo <anthony@amgcap.com>; Sonia Lai <sonialai14@gmail.com>; James Walter <jswalter@suddenlink.net>
**Sent:** Mon, April 30, 2012 6:58:50 PM
**Subject:** American Farmland Partners Financial Disclosure To Investors

Nick:
As you are aware, previous investors were sent a year-end Balance Sheet and Profit and Loss Statement
for American Farmland Partners Corporation on February 22, 2012 with assurances that additional
information would be forthcoming including a Balance Sheet and Profit and Loss Statement for
American Farmland Limited Partnership. (See attached e-mail)
When will those additional documents be available to investors?
Additionally, a number of investors have exchanged their American Farmland Partners securities for
those of U.S. Growers Farmland Liquidity Fund, Inc. in private transactions.
We will be forwarding the paperwork on those transactions and are requesting the appropriate securities
be re-issued in the name of U.S. Growers Farmland Liquidity Fund, Inc.
As investors in American Farmland Partners Corporation, Inc. and the American Farmland Limited
Partnership we are requesting detailed financial information as is our right as investors.
We are concerned about discrepancies in information and/or erroneous information relative to the
American Farmland Partners Balance Sheet and Profit and Loss Statements we have in our possession
including but not limited to;
1.) Why was this information NOT sent to all investors?
2.) Why are all investors not listed and/or why are the amounts of their investments incorrect?
3.) Please include the following in all transmittal in the future; Arun Subramanian, Sonia Lai, Andrew
Greenberg, Barry Thomas, Renata Muller, Frank Imparato, Trent Griffith, Phil Jordan, Charles Rea,
Katherine Austin, Mark Borst, Melvin Krumdick, Patrick Walls, Richard Smith, Robert Woolfolk,
Anthony Gallo, Richard Hesler, Hyatt Bangert, David Gee, George Vander Vennet and James Walter.
4.) A number of expense seem to be missing-- this is based on the fact that we are personally aware of
$6,500 having been paid to Katten, Muchin and Rosenman a law firm.
5.) What other expenses are missing from these reports?
6.) Based on your document-- $207, 500 was raised for the corporation alone and your listed expenses
total only $126, 806.56 where is the missing $80,693.44?
7.) Are investors to assume that this figure resides in a bank checking or savings account in the name of
AFPC or AFLP?
What happened to the 18 million dollars that was mention on an e-mail to investor Michael DiNapoli?
(See attached e-mail)
8.) How much money was raised by APFC and AFLP in total?
9.) It appears that Midwest Farmland Partners and American Farmland Partners have had a half a dozen
or more bank accounts over the last 4 years what is the reason for the frequent changes and why were
the bank statements not loaded onto the secure site as agreed for all investors to view along with all
other Company documents? (See attached e-mails).
10.) When can we expect copies of the bank statements for the various accounts?
11.) Why were bank statements not loaded to the secure site for all investors to review as originally
agreed?
(See attached)
12.) You note an expense of $1,718.00 for a single page website we would like to get a copy of that
check along with the checks for $4,200 in rent expenses, when may we expect copies of these and other
disbursements?

7/22/2012

# Farmland Partners Inc. Announces $10 Million Stock Repurchase Program

DENVER, Oct. 29, 2014 /PRNewswire/ -- Farmland Partners Inc. (NYSEMKT:FPI) (the "Company") today announced that its Board of Directors has approved a $10 million program to repurchase shares of the Company's common stock.

"This share repurchase program, together with management's sustained open market stock purchases, demonstrates our confidence in our ability to generate returns that are not reflected by our current stock price," said Paul Pittman, CEO of Farmland Partners Inc. "We believe that repurchasing our shares is a prudent use of our cash and a significant value creation opportunity for the company's stockholders."

Repurchases under this program will be made from time to time, in amounts and prices as the Company deems appropriate. Repurchases may be made in open market or privately negotiated transactions in compliance with Securities and Exchange Commission Rule 10b-18, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy, and other relevant factors. This share repurchase plan does not obligate the Company to acquire any particular amount of common stock, and it may be modified or suspended at any time at the Company's discretion. The Company expects to fund repurchases under the program using cash on its balance sheet. As of October 29, 2014, the Company had 9,676,755 fully diluted shares of common stock outstanding.

**About Farmland Partners Inc.**

Farmland Partners Inc. is an internally managed real estate company that owns and seeks to acquire high-quality primary row crop farmland located in agricultural markets throughout North America. The Company's portfolio is comprised of 45 farms with an aggregate of 27,549 acres in Illinois, Nebraska, Colorado, Arkansas and Louisiana, with fifteen farms under contract in Arkansas, Nebraska, Colorado and Mississippi totaling 10,639 acres. The Company intends to elect and qualify to be taxed as a real estate investment trust, or REIT, for U.S. federal income tax purposes, commencing with the taxable year ending December 31, 2014.

**Forward-Looking Statements**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 and other federal securities laws, including statements regarding the pending acquisitions and expected rents. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be beyond the Company's control. The Company faces many risks that could cause its actual performance to differ materially from the results contemplated by its forward-looking statements, including, without limitation, the timing, price or amount of repurchases, if any, under the Company's share repurchase program, the risks related to leasing farmland to third-party tenants, including delays in executing new leases and failure to negotiate leases on terms that will

**EXHIBIT 2 pg 2/2**

enable the Company to achieve its expected returns. These forward-looking statements are based upon the Company's present expectations, but the events, expectations, intentions or prospects suggested by or reflected in these statements are not guaranteed to occur or be achieved, and you should not place undue reliance on such statements. Furthermore, the Company disclaims any obligation to publicly update or revise any forward-looking statement to reflect changes in underlying assumptions or factors, of new information, data or methods, future events or other changes, except as may be required by law. For a further discussion of these and other factors that could impact the Company's future results, performance or transactions, see the section entitled "Risk Factors" in the Company's final prospectus related to its recent public offering dated July 24, 2014.

SOURCE Farmland Partners Inc.

RELATED LINKS
http://www.farmlandpartners.com (http://www.farmlandpartners.com)

**Find this article at:**
http://www.prnewswire.com/news-releases/farmland-partners-inc-announces-10-million-stock-repurchase-program-280765182.html

☐ Check the box to include the list of links referenced in the article.

EXHIBIT
# 10
GFL0145

# RIZZO & DIERSEN, S.C.
### ATTORNEYS AT LAW

**Piermario Bertolotto**
pier@rizzolaw.com
www.rizzolaw.com

3505 30th Avenue
Kenosha, WI 53144
Tel: (262) 652-5050
Fax: (262) 652-5053

May 12, 2015

**VIA FEDEX (TRACKING NUMBER 7735 8527 0260)**

Nicholas C. Hindman, Sr.
Melvin J. Simon & Associates, Ltd.
1111 Burlington Avenue, Ste 108 A
Lisle, IL 60532

RE: American Farmland Partners Corporation

Dear Mr. Hindman:

Enclosed please find the consent to convert the warrants from American Farmland Partners Corporation into stock and a check for $1,428.00. The funds are to be split as follows: $1,000.00 to convert the warrants into stock, and $428.00 to reinstate American Farmland Partners Corporation with the Illinois Secretary of State.

Should you have any questions or concerns regarding this matter, please do not hesitate to contact my office.

Very truly yours,

Piermario Bertolotto

PB/cmf
Enclosure
cc: Todd Dyer

Kenosha, WI    Racine, WI    Burlington, WI    Lake Geneva, WI    Madison, WI    Oak Brook, IL


EXHIBIT # 13



**Todd Allen <tallen@incomestreamxc.com>**

## AFPC share certificate
1 message

**Nicholas Hindman** <n.hind@sbcglobal.net>                                    Thu, May 21, 2015 at
Reply-To: Nicholas Hindman <n.hind@sbcglobal.net>
To: T Allen Dyer <tallen@incomestreamxc.com>

Please make sure this is correct.

^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^

Nicholas C. Hindman, Sr.,
Melvin J. Simon & Associates, Ltd. Office 630-541-6282 Cell 630-291-6286
1111 Burlington Avenue, Suite 108 A, Lisle, IL 60532 n.hind@sbcglobal.net
Fax 888-385-5116

This message may contain privileged or confidential information. If you are not the intended
recipient of this message, you may not make any use of, or rely in any way on, this informatic
and you should destroy this message and notify the sender by reply email.

Disclaimer: Pursuant to Treasury Regulations (Circular 230), I am required to inform you that
unless expressly stated otherwise in writing, any United States federal tax advice contained i
communication (including any attachments hereto) is not intended or written to be used, and
cannot be used, by you or any taxpayer for the purpose of avoiding penalties that may be im
on you or any other taxpayer under the Internal Revenue Code of 1986, as amended. No on
without my prior express written consent, may use any part of this communication relating to
federal tax matter in promoting, marketing or recommending a partnership or other entity,
investment plan or arrangement to any other taxpayer.

**From:** T Allen Dyer <tallen@incomestreamxc.com>
**To:** Nicholas Hindman <n.hind@sbcglobal.net>
**Sent:** Wednesday, May 20, 2015 8:49 AM
**Subject:** Re: Agriculture

Nick:
I agree 1,000 percent and Luke Besse and I talked last week and he has 20 farmers we can
The best part about our deal is that "required contribution" that farmers make of limited partn
interests.
If you remember that contribution created an incredible gearing element when you comparec
capital expenditure to the value of partnership interests held and the return
which would be based on the partnership interests contributed as a fee AND the partnership
interests we purchase to give the farmer liquidity.
Farmland Partners returns suck because rents suck.
Their share price sucks because their income sucks.

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 42 of 56   Document 96

We can legitimately generate huge internal rates of return and elevated income over what ar else in agriculture real estate funds can promise.
You and I are the still the experts in this arena having worked through numerous new models the last 7 years.

Regards,


T. Allen Dyer
Due Diligence and Risk Management       ☒ Income Stream Exchange
888-666-2352 x102

75-280 U.S. Highway 111, Suite 101
Indian Wells, California 92210
incomestreamxc.com
Facebook | Twitter | Google+


On Wed, May 20, 2015 at 6:33 AM, Nicholas Hindman <n.hind@sbcglobal.net> wrote:
We really have got to get back into Agriculture.

Attached is an article in the WSJ today about a start up providing data to farmers for a fee.

Todd, is your Canada guy still interested in helping us raise funds for the farmland limited partnership/exchange? Based on George's research, it looks like raising funds through hir could be fairly easy, but of course we need a fully organized Elmwood Capital.

Nick

^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^^
Nicholas C. Hindman, Sr.,
Melvin J. Simon & Associates, Ltd. Office 630-541-6282 Cell 630-291-6286
1111 Burlington Avenue, Suite 108 A, Lisle, IL 60532 n.hind@sbcglobal.net
Fax 888-385-5116

This message may contain privileged or confidential information. If you are not the intende recipient of this message, you may not make any use of, or rely in any way on, this informa and you should destroy this message and notify the sender by reply email.

Disclaimer: Pursuant to Treasury Regulations (Circular 230), I am required to inform you th unless expressly stated otherwise in writing, any United States federal tax advice containe this communication (including any attachments hereto) is not intended or written to be use in fact cannot be used, by you or any taxpayer for the purpose of avoiding penalties that m imposed on you or any other taxpayer under the Internal Revenue Code of 1986, as amen No one, without my prior express written consent, may use any part of this communication

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 43 of 56   Document 96

relating to any federal tax matter in promoting, marketing or recommending a partnership c other entity, investment plan or arrangement to any other taxpayer.

Agri-Business Investors Limited Partnership - AFPC share certificate.pdf
725K

\

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 44 of 56   Document 96

GFL0150

EXHIBIT #14

WM0019

# OWENS & LAUGHLIN, LLC

ATTORNEYS AND COUNSELORS AT LAW
9 CRYSTAL LAKE ROAD, SUITE 205
LAKE IN THE HILLS, ILLINOIS 60156 U.S.A

EMAIL: TOWENS@OWENSLAUGHLIN.COM
BLAUGHLIN@OWENSLAUGHLIN.COM

TELEPHONE: (847) 854-8700
FACSIMILE: (847) 854-8777

June 3, 2015

*Via Certified US Mail*
American Farmland Partners Corporation
Mr. Nicholas C. Hindmand, Sr, President
1111 Burlington Avenue, Suite 108A
Lisle, IL 60532

> Re: Agri Business Investors Limited Partnership's Demand
> Pursuant to 805 ILCS 5/7.75 for the Production of the
> Corporate Records of American Farmland Partners
> Corporation.

Dear Mr. Hindman:

On behalf of Agri Business Investment Partners, please consider this correspondence a demand pursuant to the Illinois Business Corporation Act, section 805 ILCS 5/7.75, for you to produce the corporate records of American Farmland Partners Corporation (AFPC) within 14 days. Your production must include the following records of:

> (a) Copies of all minutes of the proceedings of AFPC's
> shareholders between April 5, 2010 to the present;

> (b) Copies of all minutes of the proceedings of AFPC's
> directors between April 5, 2010 to the present;

> (c) Copies of all records identifying past and/or present AFPC
> shareholders, including the names of said shareholders, the
> number and class of the shares held by said shareholders, as
> well as each such shareholder's address between April 5, 2010 and the present;

*Mr. Nicholas C. Hindman*
*June 3, 2015*
*Page 2*

      (d)    Copies of all shareholder records maintained by AFPC
               between April 5, 2010 and the present.

      (e)    AFPC's bank statements, profit and loss statements, balance
               sheets and books and records of account between April 5, 2010 and the present;

      (f)    Copies of all records identifying past and/or present AFPC voting
               trust agreements filed with AFPC between April 5, 2010 and the
               present.

Pursuant to 805 ILCS 5/7.75, please produce the records requested by June 18, 2015. As president of AFPC, your failure to produce said records will subject you to sanctions and penalties identified in section (d) of said statute. Be advised that my client stands ready to aggressively file an action compelling the production of the records called for in this demand, as well as payment of my client's legal fees and costs incurred for the filing of said action.

Sincerely,

Troy C. Owens

Cc:    Lucca Fabbri
        Phillip Jordan
        Frank Imparato
        Trent Griffith

EXHIBIT # 75

WM0033

lowens@owenslaughlin.com

Mail

Move to Inbox    More

COMPOSE

Fwd: Request for Information on American Farmland Partners Corporation    Inbox x

Inbox (5,779)
Starred
Sent Mail
Drafts (46)
Notes
More

Search people...
Looks like you don't have anyone to chat with yet. Invite some contacts to get started.
Learn more

Troy Owens <owens@owenslaughlin.com>
to me

Troy Owens
Owens & Laughlin LLC
8 Crystal Lake Road, Suite 205
Lake in the Hills, IL 60156

847.854.8700
847.854.8777 (f)

This email message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and a review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original me

Begin forwarded message:

From: Nicholas Hindman <n.hind@sbcglobal.net>
Subject: Re: Request for Information on American Farmland Partners Corporation
Date: July 29, 2015 at 12:33:33 PM CDT
To: "owens@owenslaughlin.com" <owens@owenslaughlin.com>
Reply-To: Nicholas Hindman <n.hind@sbcglobal.net>

Mr. Owens:

Today I received by Federal Express a demand for the above referenced information.

I will respond to you within 14 days of today, as you have demanded.

Nick Hindman

^^^^^^^^^^^^^^^^^^^^^^^^^^^
Nicholas C. Hindman, Sr.,
Melvin J. Simon & Associates, Ltd. Office 630-541-6282 Cell 630-291-6286
1111 Burlington Avenue, Suite 108 A, Lisle, IL 60532 n.hind@sbcglobal.net
Fax 888-385-5116

This message may contain privileged or confidential information. If you are not the intended recipient of this message information, and you should destroy this message and notify the sender by reply email.

Disclaimer: Pursuant to Treasury Regulations (Circular 230), I am required to inform you that, unless expressly stated contained in this communication (including any attachments hereto) is not intended or written to be used, and in fact avoiding penalties that may be imposed on you or any other taxpayer under the Internal Revenue Code of 1986, as a use any part of this communication relating to any federal tax matter in promoting, marketing or recommending a part

HINDMAN KRUMDICK
SAID I WERE
AND I WERE OUT. 2011
BOUGHT 2012
AND

EXHIBIT # 16

# JOHNSON&BELL
### TRIAL LAWYERS

William V. Johnson
DIRECT: (312) 984-0218
EMAIL: JOHNSONW@JBLTD.COM

April 14, 2016

*Via Certified U.S. Mail and Email:*
Nicholas Hindman
President
American Farmland Partners Corporation
1111 Burlington Avenue, Suite 108A
Lisle, IL 60532
n.hind@sbcglobal.net

> **Re:** *Agri Business Investors Limited Partnership's 805 ILCS 5/7/75*
> *Demand for Production of the Corporate Books and Records of*
> *American Farmland Partners Corporation*

Dear Mr. Hindman:

In early June of 2015, you received the enclosed demand letter from Troy Owens, former counsel for Agri Business Investors Limited Partnership ("ABILP"), which was dated June 3, 2015. That letter made a demand—on behalf of ABILP, a shareholder of American Farmland Partners Corporation ("AFPC") —for you to produce, pursuant to the Illinois Business Corporation Act, AFPC's books and records of account, minutes, voting trust agreements filed with the corporation, and record of shareholders. Specifically, the June 3, 2015 letter requested production of the following records:

(a) Copies of all minutes of any AFPC shareholder meetings and/or proceedings from April 5, 2010 to the present;

(b) Copies of all minutes of any AFPC board of director meetings and/or proceedings from April 5, 2010 to the present;

(c) Copies of all records identifying past and/or present AFPC shareholders, including the names of said shareholders, the number and class of the shares held by said shareholders, as well as each such shareholder's known addresses from April 5, 2010 to the present;

(d) Copies of all shareholder records maintained by AFPC between April 5, 2010 and the present;

(e) AFPC's books and records of account between April 5, 2010 and the present, including, but not limited to, bank statements, profit and loss statements, balance sheets;

(f) Copies of all records identifying past and/or present AFPC voting trust agreements filed with the corporation from April 5, 2010 to the present.

WM0023

# JOHNSON&BELL
### TRIAL LAWYERS

Despite ABILP's status of as a shareholder of AFPC and rights to production of these books and records, you have refused to produce them upon request as required by the Illinois Business Corporation Act (805 ILCS 5/7.75). ABILP will file an action compelling the production of the above referenced books and record of AFPC if ABILP does not receive them within twenty-one (21) days of your receipt of this letter. As you know, ABILP will also be entitled to legal fees and costs, including attorney's fees, when it is successful in such an action.

For the sake of clarity, please consider this letter a written demand upon AFPC for production of the books and records sought above as required by Illinois Business Corporation Act. Pursuant to the Act, the purpose of this request is to investigate whether certain shareholders, directors, or officers of AFPC breached their fiduciary duties to the corporation and other shareholders.

Very truly yours,

JOHNSON & BELL, LTD.

*William V. Johnson*

William V. Johnson

EXHIBIT # 19

# M Gmail

## Fwd: Greetings
1 message

**frmelk@aol.com** <frmelk@aol.com>
To: ycart22@gmail.com, frmelk@aol.com

Thu, Aug 30, 2018 at 3:28 PM

**Tracy,**
**for the files**

## PEACE
## FR MEL

-----Original Message-----
From: frmelk <frmelk@aol.com>
To: n.hind <n.hind@sbcglobal.net>; Frmelk <Frmelk@aol.com>
Sent: Wed, Aug 29, 2018 2:48 pm
Subject: Re: Greetings

**Nick:**

**Thank you for your cooperation.**

## PEACE
## FR MEL

-----Original Message-----
From: Nicholas C. Hindman, Sr. <n.hind@sbcglobal.net>
To: Mel Krumdick <frmelk@aol.com>
Cc: Mark Borst <markborst3@hotmail.com>
Sent: Wed, Aug 29, 2018 1:37 pm
Subject: Greetings

Mel:

It was nice to hear from you. Hope you are well.

My probation officer gave me a copy of the letter that you sent to her, addressed to me, from AgriBusiness Investors Partnership.

The government took all of my records so I suggest you contact them to see if they will provide copies to you, they have all the original documents.

To help you in that regard, I am sending a copy of your letter to the US Attorney in Milwaukee, maybe his office can be of assistance to you.

Best wishes,

Nick

Case 2:19-cv-01319-PP   Filed 02/01/22   Page 52 of 56   Document 96

As you know, we have made more than four (4) written requests for the corporate records of American Farmland Partners Corporation and the records of its affiliated private limited partnership, American Farmland Limited Partnership going back to 2012 and never received anything.

Joe Wall is not going to run interference for you on this.

Under Illinois law we are entitled to these records as shareholders under 805 ILCS 5/7.75.
As you are also aware, we may receive a growing number of AFPC's authorized, unissued shares the longer you resist and deny our requests until such time as we control AFPC and its successor publicly traded Farmland Partners AND ITS affiliated limited partnership Farmland Partners Operating Partnership, L.P.

I am wondering why you would contact Mark, certainly the conditions of your probation preclude you from having contact with your victims?
**We are just about to file suit against Mark.**

My suggestion is that you get Pittman, Fabbri and Hough to contact us and fashion a settlement before this gets out of hand.

Why haven't you done a bankruptcy of AFPC and AFLP if these entities in fact failed?
We need to know the location, condition and valuation of our business concept, intellectual property and trade secrets and will force and bankruptcy on AFPC, AFLP, publicly traded Farmland Partners and its affiliated entities if necessary to accomplish
this if we have to Nick.

PEACE
FR MEL

 **Gmail**

TL B <ycart22@gmail.com>

---

## Fwd: COOPERATION
1 message

**frmelk@aol.com** <frmelk@aol.com>
To: ycart22@gmail.com, frmelk@aol.com

Thu, Aug 30, 2018 at 3:26 PM

**Tracy,**
**For the files on Nick.**

**PEACE**
**FR MEL**


-----Original Message-----
From: Nicholas C. Hindman, Sr. <n.hind@sbcglobal.net>
To: frmelk <frmelk@aol.com>
Cc: Mark Borst <markborst3@hotmail.com>
Sent: Wed, Aug 29, 2018 8:34 pm
Subject: Re: COOPERATION

Mel:

First, Mark is not one of "my" victims that was all you and Todd. I also believe he is the sole owner of AgriBusiness Investors Partnership anyway, you and Todd have no standing in that company since Mark bought you and Todd out for $25,000 each, in case you forgot.

Do not contact me again in anyway, or I will go to the US Attorney's office and the Judge concerning this harassment, and perhaps they will reconsider their charges against you.

I would stay out of this if I were you, there is nothing to win, and a lot for you to lose, including your freedom.

Nick

---

From: "frmelk@aol.com" <frmelk@aol.com>
To: n.hind@sbcglobal.net; frmelk@aol.com
Sent: Wednesday, August 29, 2018 8:18 PM
Subject: COOPERATION

**Nick:**

Case 2:19-cv-01319-PP    Filed 02/01/22    Page 54 of 56    Document 96

## IN THE 18TH JUDICAL CIRCUIT COURT
## DUPAGE COUNTY, STATE OF ILLINOIS

|  |  |
|---|---|
| Melvin E. Krumdick and and Todd A. Dyer doing business as Agri Business Investors, LP, Plaintiffs, | ) ) ) ) ) ) ) ) |
| v. | ) ) |
| Nicholas C. Hindman, Sr. Defendant, | ) ) |

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 9877875
2019MR000746
FILEDATE: 7/24/2020 12:11 PM
Date Submitted: 7/24/2020 12:11 PM
Date Accepted: 7/24/2020 1:28 PM
AM

2019-MR-000746
Case Number

## RESPONSE TO MOTION FOR DEFAULT JUDGEMENT

The Motion for Default Judgement was received via Priority Mail by me on Saturday July 11.

Over the past 7 plus years, Mr Krumkick and Todd A. Dyer, who is currently serving a 15-year Federal prison sentence for fraud, have been harassing me for damages on their nonexistent "IP" and "trade secrets" as well as a failed "business model". They have sent countless threats of lawsuits to my home and business addresses, so I ultimately began to just refuse to accept delivery on correspondence from them.

Facts related to this Case:

There is no intellectual property or trade secrets and of course the specifics of what the plaintiffs believe these attributes consist of are not detailed in their filings. There was a business model though, which consisted of contacting operating farmers and proposing a transaction with them that would result in their farmland being owned by one of the various Todd Dyer entities for which the farmer would receive, a combination of cash, stock, partnership interests and/or other ownership interests. The farmer would continue to live on and operate the farm, put only as "partner" in one of Mr. Dyer's companies. In three years plus of attempting to entice farmers to

EXHIBIT #18

IN THE 18TH JUDICAL CIRCUIT COURT
DUPAGE COUNTY, STATE OF ILLINOIS

Melvin E. Krumdick and
and Todd A. Dyer
doing business as
Agri Business Investors, LP,
Plaintiffs,

)
)
)
)
)
)
)
)

v.

)
)

Nicholas C. Hindman, Sr.
Defendant,

)
)

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 9877875
2019MR000746
FILEDATE: 7/24/2020 12:11 PM
Date Submitted: 7/24/2020 12:11 PM
Date Accepted: 7/24/2020 1:28 PM
AM

2019-MR-000746
Case Number

## RESPONSE TO MOTION FOR DEFAULT JUDGEMENT

The Motion for Default Judgement was received via Priority Mail by me on Saturday July 11.

Over the past 7 plus years, Mr Krumkick and Todd A. Dyer, who is currently serving a 15-year Federal prison sentence for fraud, have been harassing me for damages on their nonexistent "IP" and "trade secrets" as well as a failed "business model". They have sent countless threats of lawsuits to my home and business addresses, so I ultimately began to just refuse to accept delivery on correspondence from them.

Facts related to this Case:

There is no intellectual property or trade secrets and of course the specifics of what the plaintiffs believe these attributes consist of are not detailed in their filings. There was a business model though, which consisted of contacting operating farmers and proposing a transaction with them that would result in their farmland being owned by one of the various Todd Dyer entities for which the farmer would receive a combination of cash, stock, partnership interests and/or other ownership interests. The farmer would continue to live on and operate the farm, put only as "partner" in one of Mr. Dyer's companies. In three years plus of attempting to entice farmers to