UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No. 19-cv-1319-pp

TODD A. DYER,

        Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION REQUESTING COURT DETERMINE OWNERSHIP OF THE AMERICAN FARMLAND PARTNERS CORPORATION STOCK WARRANTS (DKT. NO. 96) AND DENYING DEFENDANT'S MOTION TO RECONSIDER COURT'S DECISION DENYING APPOINTMENT OF SUCCESSOR COUNSEL (DKT. NO. 101)**

---

On February 1, 2022, the court received from the defendant a document titled "Motion Requesting Court Determine Ownership of the American Farmland Partners Corporation Stock Warrants." Dkt. No. 96. Nearly a month later, the court received his motion asking the court to reconsider its decision declining to appoint successor counsel. Dkt. No. 101. Three weeks later, the court received from the defendant a motion asking the court to order his prior counsel to return to him his "evidentiary materials." Dkt. No. 107. Finally, on April 6, 2022, the court received a motion from the defendant asking the court to adjourn the evidentiary hearing that had been scheduled for April 19, 2022 at 9:00 a.m. Dkt. No. 109. The court has, by separate order, denied the third motion and granted part of the fourth. It will deny the first two motions and

1

address one of the requests in the fourth motion ahead of what now will be the April 19, 2022 scheduling conference.

I. **Motion Requesting Court Determine Ownership of the American Farmland Partners Corporation Stock Warrants (Dkt. No. 96)**

In June 2015, the grand jury indicted the defendant, Nicholas Hindman, Melvin Krumdick and Tracy Bolton,[1] alleging that between March 2008 and August 2012, the defendants committed a fraud "to obtain funds from potential investors under materially false pretenses that their funds would and were being used to purchase farm property or interests in farm property, and that the defendants had actually purchased farm property," when in fact the defendants had not purchased any farms or interests in farms and had used the money obtained from investors for themselves. United States v. Dyer, Case No. 15-cr-115-JPS (E.D. Wis.), Dkt. No. 1 at ¶¶1-2. The defendant previously had been convicted in the Eastern District of Wisconsin of mail fraud and money laundering. United States v. Dyer, Case No. 98-cr-176 (E.D. Wis.).

On December 2, 2016, the government moved to dismiss the indictment as to Krumdick. Dyer, Case No. 15-cr-115, Dkt. No. 185. The government explained that it had decided to seek dismissal of the charges against Krumdick because Krumdick's counsel had convinced the government that it had proof problems as to Krumdick; that the government had become convinced that Krumdick's wearing of clerical garb during an investor meeting (Krumdick had been a Catholic priest but had been dismissed from his order in

---

[1] A superseding indictment handed down sixteen months later omitted Bolton as a defendant. United States v. Dyer, Case No. 15-cr-115 at Dkt. No. 137.

1999) occurred only once and that Krumdick had not been aware that church rules prohibited him from wearing clerical garb in public; and that Krumdick's counsel had provided the government with evidence that Krumdick's health was "terrible." Id. at Dkt. No. 190. The court granted the motion. Id. at Dkt. No. 189.

On December 4, 2016, Nicholas Hindman signed a plea agreement, admitting his role in the fraud scheme and that he participated in it with the defendant and Krumdick. Id., Dkt. No. 195 at 14.

On December 5, 2016, the defendant's jury trial began; the defendant had elected to represent himself. Id. at Dkt. No. 213. On the morning of December 7, 2016, however, after two days of trial, the government informed the court that the defendant had indicated that he wished to plead guilty in Case No. 15-cr-115 and in another case pending in this district. Id., Dkt. No. 201 at 18-19. That same day, the defendant signed a plea agreement. Id., Dkt. No. 198 at 15.

The factual basis for that plea explained that the defendant had founded a "promotional entity" called Midwest Farmland Partners (MFP) and that this entity was used to solicit investments for the purported purpose of purchasing farmland in the Midwest. Id. at p. 16, ¶5. It explained that between March 2008 and September 2011, the defendant offered and sold investments through MFP "and its successor entities, including American Farmland Partners (AFP)." Id. It stated that to "conceal his past," the defendant had used an alias—"Allen Todd"—with investors. Id.

3

The factual basis explained that MFP "operated through two related entities, Midwest Farmland Limited Partnership (MFLP) and Midwest Farmland Management Corporation (MFMC)." Id. at p. 17, ¶8. Hindman, who'd been hired by the defendant in 2008, was the CFO and secretary of those two entities. Id. The defendant incorporated Midwest Farmland Acquisitions Corporation, MFAC, in 2008, with its principal office at his home address; he owned MFAC with Krumdick. Id. at p. 17, ¶11. The entities—MFP, MFLP and MFMC—were marketed to investors "as an investment vehicle that was to purchase family farms with investor funds whereby the farmers would continue to occupy and operate their farms and investors would profit from, among other things, appreciation in the value of the farm property." Id. at p. 17, ¶9. As marketed, the farmers were to receive cash, partnership interests, stock or a combination of the three as payment for their farms. Id. Although the defendant and Hindman offered and sold MFLP partnership interests to investors for $1,000 each and represented that those interests would accrue a 6% annual return, the factual basis states that no farms or farmland were purchased through MFP or the related entities. Id. at 17, ¶¶10, 12.

The factual basis explained that American Farmland Partners—AFP—was a successor entity to Midwest Farmland Partners, characterizing AFP as "simply a name change from" MFP. Id. at 18, ¶13. Like MFP, AFP consisted of two entities—American Farmland Partners Corporation (AFPC) and American Farmland Limited Partnership (AFLP). Id. at 18, ¶14. Hindman incorporated AFPC in 2010 and was the president, secretary and director. Id. at 18, ¶15. As

4

they had with MFP, the defendant and Hindman solicited investors to buy stock in AFPC, promising the investors that "their investment would rapidly grow as a result of a purported future Initial Public Offering," which never occurred. Id. Again, the defendant and Hindman sold the AFLP partnership interests to investors for $1,000 each, and again, AFP and the related entities never purchased any farms or farmland. Id. at 18, ¶¶16, 17.

The factual basis stated that in September 2010, the defendant, Krumdick and a third person opened a bank account in the name of Agri-Business Investors Partnership (ABIP). Id. at 18, ¶18. "Through the terms of a September 25, 2010 buy-out agreement, [the defendant], KRUMDICK and the third individual received stock warrants[2] from HINDMAN in exchange for being bought out of AFP." Id. Hindman also agreed to share with the defendant and Krumdick "the investor proceeds that he obtained from his and [the defendant's] continued marketing of AFP and its related entities." Id. The factual basis stated that after this buy-out agreement, the defendant received investor funds from Hindman through Hindman's sale of stock and partnership interests in AFP and the related entities, as well as through the sale of stock warrants, and that the proceeds from the sale of these items were deposited into the ABIP bank account. Id. at 18, ¶19.

The factual basis describes a series of false statements the defendant and Hindman made to induce individuals to invest—that the defendant's name

---

[2] "A stock warrant is a contract that lets you buy or sell shares of a company's stock at a specific price on a specific date." https://www.forbes.com/advisor/investing/stock-warrants/ (last visited April 13, 2022).

was "Allen Todd," that Hindman was a CPA (even though his license had been suspended in 1997), that multiple farmers were participating in the project, that the various investment entities had purchased farmland. Id. at 18-19, ¶¶20-23. The defendants made false representations about how much investor money they'd raised, how much was available for purchasing farms and how much they themselves had invested in MFP and AFP. Id. at p. 19, ¶¶27-28. The defendant falsely represented that certain regulatory forms had been filed for the entities, that there would be an IPO that would increase the value of the investors' investments and that universities were interested in investing in the entities with endowment funds. Id. at 19, ¶¶29-30, 32.

The factual basis indicated that the defendant used some of the investor funds to make expenditures at a gentlemen's club and that he withdrew over $169,000 of the funds in cash. Id. at 20, ¶33. It stated that Hindman used some of the funds to make more than $48,000 in payments to his wife (who didn't work for any of the entities) and that he transferred more than $112,000 to an unrelated business account.

In the early afternoon of December 7, 2016, the defendant appeared before Magistrate Judge David E. Jones. Id. at Dkt. No. 199. Judge Jones conducted a plea colloquy that lasted over thirty minutes; he questioned the defendant and found him competent to enter a plea. Id. The government provided an oral offer of proof regarding the crime to which the defendant was pleading guilty. Id. Judge Jones recommended that the court accept the

6

defendant's guilty plea. Id. at Dkt. No. 202. Judge J.P. Stadtmueller accepted that recommendation, and the defendant's plea. Id. at Dkt. No. 205.

In preparation for sentencing, the government provided the court with a more detailed factual statement, indicating that one of the defrauded investors was Mark Borst, a used car dealer from whom the defendant had purchased some vehicles. Id., Dkt. No. 216 at ¶46. In response to the defendant's representations about MFP's predicted 6% "guaranteed" returns and the purported IPO, Borst wrote a check to MFAC for $50,000. Id. During 2008 and 2009, Borst wrote numerous checks to MFAC in amounts requested by the defendant (often when the MFAC account was low on funds). Id. at ¶47. Over that period, Borst wrote $696,000 in checks to MFAC; he would occasionally receive cashier's checks from the defendant, issued by "Farmland Partners," represented to be returns on Borst's investments. Id.

The defendant had Borst open a bank account for MFAC in Borst's name and list Borst as vice president, although Borst had no role in the company. Id. at ¶48. Borst was the "third individual" mentioned in the factual basis of the plea agreement in relation to the September 2010 buy-out of Hindman; Borst agreed to partner with the defendant and Krumdick and the three received "stock warrants" in AFPC from Hindman in exchange for the defendant and Krumdick's interests in AFP. Id. At the defendant's direction, Borst and Krumdick opened the Agri-Business Investors Partnership bank account. Id. The defendant then began advertising and selling the stock warrants received through the buy-out to other people. Id. He would tell Borst about the sales,

7

then have Borst sign certificates transferring the stock warrants; Borst believed that these transactions were legitimate. Id. When the money the purchaser had paid for the stock warrants landed in the ABIP bank account, the defendant would have Borst withdraw it and provide it to the defendant, Krumdick and Borst as cashier's checks and cash. Id. This process insulated the defendant from the fraudulent sales. Id.

Borst received about $292,583 in "returns" from MFAC and from the sale of the stock warrants. Id. at ¶49. In 2011, he received a call from someone who refused to identify himself, stating that the caller wanted to purchase ABIP, but only if the defendant and Krumdick were removed from the business. Id. at ¶50. Based on this phone call, Borst paid the defendant and Krumdick each $25,000, which he thought was for the purpose of buying out their interests. Id. The caller never contacted Borst again, and the defendant and Krumdick did not return the $50,000. Id.

In the more than five years since he signed the December 7, 2015 plea agreement, admitted to the facts recounted in that agreement and entered his guilty plea before Judge Stadtmueller, the defendant has repeatedly asserted that he is not guilty of the fraud to which he pled. He attempted to withdraw his guilty plea and filed both an appeal and a *habeas* petition. Since the government filed this civil suit for a protective order to prevent the defendant from suing and otherwise allegedly harassing the victims of the fraud schemes, the defendant has filed numerous documents outlining an intricate, complex, convoluted theory of why he not only is not guilty of the fraud, but why he has

8

valid claims against some of the individuals identified as victims. The most recent document is this motion, asking this court to determine the ownership of "the American Farmland Partners Corporation stock warrants." Dkt. No. 96.

The defendant agrees that he, Borst and Krumdick received stock warrants from the September 25, 2010 buyout—presumably from Hindman. Dkt. No. 96 at 1. He says that when the buyout agreement was executed, Midwest Farmland Limited Partnership (MFLP) became American Farmland Limited Partnership (AFLP), "an entity controlled by [American Farmland Partners Corporation] AFPC." Id. He asserts that the "buy-out" involved AFPC purchasing "the business model, intellectual property and trade secrets developed by [the defendant] for Midwest Farmland Partners (MFP)." Dkt. No. 96 at 1. He says that under the buyout agreement, he and Krumdick "were to also maintain an ownership stake in AFLP, through AFPC, and to receive commissions when AFLP made land acquisitions." Id. He claims, however, that the stock warrants were not issued to him, Krumdick and Borst "individually, but to their designatee [sic], Illinois based Agri Business Investors LIMITED Partnership (ABILP), as evinced by the stock warrant attached to the buyout agreement." Id. He maintains that the buy-out "was between AFPC as purchaser, and Borst, [Krumdick], and [the defendant] as sellers," and that "ABILP was the recipient of the stock warrants which constituted consideration for the buyout." Id.

The defendant claims that there were two Agri Business entities—Agri Business Investors GENERAL Partnership (ABIGP), formed in 2010 and Agri

9

Business Investors LIMITED Partnership (ABILP), formed (the defendant says) on October 2, 2014. Id. The defendant asserts that the stock warrants were owned by ABI*L*P. Id. at 2. He claims that his "standing" (by which the court understands him to mean his ownership or management interest) in Agri Business Investors *General* Partnership "was terminated September 25, 2010 as documented in the secondary buyouts," then claims two sentences later that "[o]n December 22, 2011, Borst bought [the defendant] out of ABIGP" for $25,000. Id. The defendant asserts that there was supposed to be a "redesignation" of the AFPC stock warrants from ABI*L*P to ABI*G*P, but that this never happened and that ABI*L*P continues to own the stock warrants. Id.

The defendant asserts that on July 27, 2011, Hindman sent an email to him and others, discussing the need to amend the buyout and warrant agreements to reflect the proper partnership name. Id. The defendant says that Hindman attached to that email a partnership agreement for ABI*G*P that indicated that ABI*G*P was valued at $10,000,000. Id. He says that in April 2014, a company called Farmland Partners went public,[3] and that on October 29, 2014, it issued a press release announcing a $10,000,000 stock repurchase program. Id. at 3. According to the defendant, "[t]he 10 million dollars referenced" "coincides with the 10 million dollar valuation placed on

---

[3] There *is* a public company called Farmland Partners, with the New York Stock Exchange designation FPI. http://www.farmlandpartners.com/. It made its initial public offering in April 2014; its CEO since that time has been Paul Pittman, a University of Chicago-educated lawyer with a long career in mergers and acquisitions, investment banking and accounting; its president is Luca Fabbri, its CFO is James Gilligan. http://www.farmlandpartners.com/about-us/

ABIGP, and represents a select group of the 115Farmland case victims being paid for their original investments in Midwest and American, excluding [Krumdick], [the defendant], and perhaps others." Id.

The defendant says that he has been asking Hindman for documents to demonstrate that his suspicions are correct but that Hindman hasn't cooperated. Id. at 3-5.

He concludes with this opaque statement:

> Based on the foregoing, establishing who owns the American Farmland Partners corporation stock warrants is necessary to establish Father Mel [Krumdick], [the defendant] and the Agri Business Investors LIMITED Partnership (ABILP) as the legal owner of the AFPC stock warrants, and consequently, Father Mel, [the defendant] and ABILP standing, the existence of a meritorious lawsuit against Borst, and future lawsuits against Borst, Hindman, the 115Farmland case victims, publicly-traded Farmland Partners, Inc. (FPI: NYSE), and FPI's affiliated, private, limited partnership, Farmland Partners Operating Partnership, L.P.

Id. at 4.

The complaint filed on December 21, 2018 against Borst in Walworth County Circuit Court—one of the suits that led the government to file the case, signed by Krumdick but, the government alleges, directed by the defendant—alleged that Borst "loaned" MFAC "$800,000 toward the start-up and development costs of MIDWEST FARMLAND PARTNERS." Dkt. No. 1-17 at 3, ¶18. It asserted that in 2010, Krumdick and Borst sold "the MIDWEST FARMLAND PARTNERS business concept, related intellectual property, and trade secrets in a Buyout Agreement dated September 25, 2010, to successor entity AMERICAN FARMLAND PARTNERS," for which they received stock warrants in AFPC. Id. at 3, ¶19. It asserted that a condition of the buyout

11

agreement was that AFPC "was required to be a publicly traded entity with one (1) year at a minimum share price of five dollars ($5.00) or issue sellers and additional one-and-a-half (1.5) million 'penalty' warrants." Id. at 3, ¶21. The complaint alleged that "FARMLAND PARTNERS, INC." went public in April 2014 "and has acquired nearly one-and-a-half (1.5) billion dollars of U.S. Farmland . . . using business concepts, intellectual property, and trade secrets owned by" Krumdick "and other former MIDWEST and AMERICAN FARMLAND PARTNERS investors." Id. at 3, ¶29. It alleged that Borst and others "convinced . . . FBI, IRS, US Attorney Office in Wisconsin . . . that [Borst] was a passive, unknowing investor who had been victimized by [the defendant] and the [Borst] had bought [the defendant's] AMERICAN FARMLAND PARTNERS CORPORATION stock warrants in a 2012 transaction." Id. at 4, ¶31. It asserted that Krumdick controlled 5,499,000 stock warrants through AFLP and that Borst fraudulently exchanged the stock warrants for publicly traded Farmland Partners stock, "thereby denying [the defendant] of his original investment, a return on his original investment (profit) and control over the world's fastest growing farmland Real Estate Investment Trust (REIT), publicly traded FARMLAND PARTNERS, INC., and its affiliated, private, limited partnership, FARMLAND PARTNERS OPERATING PARTNERSHIP, L.P." Id. at 5.

      The court will deny the defendant's motion. Article III, section 2 of the Constitution gives a federal court jurisdiction over "Cases" and "Controversies." "Article III's 'case or controversy' requirement prohibits federal courts from issuing advisory opinions that do not affect the rights of the parties before the

12

Case 2:19-cv-01319-PP    Filed 04/14/22    Page 12 of 19    Document 113

court." Matlin v. Spin Master Corp., 979 F.3d 1177 1181 (7th Cir. 2020) (citing Preiser v. Newkirk, 422 U.S. 395, 401 (1975)). There is no lawsuit before the court asking the court to resolve the question of who owns the stock warrants. The government did not file this case for the purpose of asking the court to decide who owns the stock warrants. No other party has filed a lawsuit asking the court to determine who owns the stock warrants.

The sole question this court must decide in determining whether to issue the protective order is whether "there are reasonable grounds to believe that harassment of an identified victim or witness in a Federal criminal case exists." 18 U.S.C. §1514. "Harassment" is "a course of conduct directed at a specific person that—(A) causes substantial emotional distress in such person; and (B) serves no legitimate purpose." 18 U.S.C. §1514(c)(1); United States v. Lewis, 411 F.3d 838, 843 (7th Cir. 2005)).

As best the court can tell, the defendant seeks to argue in this case that any lawsuit he brought in the past, or might bring in the future, against anyone identified as a victim in Case No. 15-cr-115 served a legitimate purpose. The court is mystified about how the question of who owns stock warrants issued by Nicholas Hindman—who has pled guilty to and been convicted of the fraud described in Case No. 15-cr-115—has any relevance to whether any lawsuit the defendant might have brought or might bring against anyone identified as a victim in that case has a legitimate purpose. The defendant and Hindman have been convicted of making false statements and misrepresentations to investors to cause them to invest money into American

13

Farmland Partners and its predecessor entity, Midwest Farm Partners. Even if they were not fraudulent, whatever value any AFPC stock warrants may have had would have been derived from money unlawfully obtained from investors through fraud. If such stock warrants exist and if anyone "owns" them, that person owns the right to purchase stock in a company funded through fraud. The defendant cannot engage in fraud—which he did, as established by his guilty plea and sentencing—then argue that he has a right to ill-gotten gains resulting from that fraud.

The defendant pled guilty to a fraud in which Borst and many others were identified as victims. The defendant's attempt, through the Walworth County litigation, to convince a court that Borst duped the FBI, the IRS and the U.S. Attorney's Office into believing that he was a victim of the 15-cr-115 fraud is nothing more than a blatant attempt to re-litigate the criminal case in which the defendant pled guilty—something this court has repeatedly told him it will not allow him to do. For the defendant to argue in the context of this suit that any individuals—not just Borst—were not victims is an attempt to do what he could not do through his effort to withdraw his guilty plea, his appeal and his *habeas* petition—demonstrate his innocence.

It is unclear why the defendant believes that a reference in a partnership agreement that ABIGP was worth $10,000,000 relates to the public offering of a seemingly unrelated company called Farmland Partners, nor does it understand why he believes that this somehow shows that the victims in Case No. 15-cr-115 got some of their money back. But if the victims *did* get some of

14

their defrauded money back, the defendant—one of the people who defrauded them of that money—certainly would not be entitled to it.

The court will deny the defendant's motion to determine the ownership of the AFPC stock warrants. There is no case or controversy before the court that requires the court to make that determination and the decision is irrelevant to whether the defendant's contacts with and lawsuits against Borst and others had any legitimate purpose.

## II. Motion to Reconsider (Dkt. No. 101)

Shortly after the government filed this lawsuit, the court granted the government's motion for a preliminary injunction. Dkt. No. 12. In that order, the court recounted the defendant's history with lawyers. Id. at 4 n.1, 8 at n.3. In particular, the court observed the following with regard to Case No. 16-cr-100—the criminal case over which the undersigned presided:

> The grand jury indicted the defendant in case no. 16-cr-100 on June 28, 2018—two weeks after Patrick Cafferty was appointed standby counsel for the defendant in the case before Judge Stadtmueller. United States v. Dyer, Case No. 16-cr-100, Dkt. No. 1. [Magistrate] Judge [David] Jones conducted the arraignment, at which the defendant noted that he was representing himself in his other cases and wanted to represent himself in this one. Id., Dkt. No. 6 at 1. An attorney from Federal Defender Services was present as standby counsel for the arraignment. Id. The plea agreement in this case was signed by the defendant and his standby counsel from the case before Judge Stadtmueller, Attorney Pruhs. Id. at Dkt. No. 30, page 15.

Id. at 8 n.3.

Although the court was aware that the defendant had elected to represent himself in his criminal cases, and that he had fallen out with three attorneys in Case No. 15-cr-115, the court nonetheless asked the Federal

15

Defender to have standby counsel available at the first hearing in this *civil* case. Id. at 25. The court was not required to appoint counsel for the defendant; "[t]here is no constitutional or statutory right to counsel in federal civil cases." Romanelli v. Suliene, 615 F.3d 847, 851 (7th Cir. 2010) (citations omitted). But the court exercised its discretion to ask Federal Defender Services to have counsel on standby. At the October 11, 2019 hearing, Attorney Robert Penegor appeared as standby counsel, and the court gave the defendant an opportunity to speak privately with him. Dkt. No. 20 at 1. The defendant subsequently indicated that he would like Attorney Penegor to represent him, and the court exercised its discretion and appointed Attorney Penegor, over the objection of the government. Id. at 2; Dkt. No. 13. Not surprisingly, given the defendant's history with lawyers, the defendant and Attorney Penegor had a falling out, resulting in both of them asking the court to allow Penegor to withdraw. Dkt. Nos. 84, 85. The court granted that motion. Dkt. No. 92. In a subsequent order, the court explained, in detail, why it was not willing to appoint successor counsel—the defendant's history with lawyers, his persistence in filing documents even when he was represented and the court's doubts that the defendant would be able to get along with any other lawyer the court might appoint. Dkt. No. 95 at 17-20.

The defendant has asked the court to reconsider its decision not to appoint successor counsel. Dkt. No. 101. He points out that the court stated in its order declining to appoint successor counsel that it had appointed Attorney Penegor to protect the defendant from himself, and he argues that he still

needs protection from himself. Id. at 1. He finds it "noteworthy" that "the court felt the need to appoint counsel in the 19-CV-1319-PP Temporary Restraining Order case, a civil proceeding, but failed to exercise the same discretion in the 100Bakley criminal case." Id. He asserts that the court's concerns about his need for protection from himself are "likely well founded" because of his alleged history of mental health issues. Id. at 1-2. He asks the court to reconsider its prior decision, appoint him successor counsel and "order a competency determination be made by a professional to protect" his rights "and the integrity of the proceedings." Id. at 2.

The court will deny this motion. The defendant may well be correct that he continues to need protection from himself; he has exercised demonstrably poor judgment throughout the criminal and civil proceedings against him. But the court gave him a chance to avail himself of that protection. The defendant could not bring himself to trust his lawyer—someone who he himself pointed out in another pleading had extensive experience—any more than he had trusted the other lawyers who'd represented him or acted as standby counsel. A lawyer cannot protect from himself a defendant who refuses that protection.

As for the defendant's implication that it is ironic that the court appointed him counsel in this civil case but did not do so in the criminal case, the defendant told Judge Jones—after Judge Jones had conducted in Case No. 15-cr-115 the colloquy required under Faretta v. California, 422 U.S. 806 (1975)—that he wanted to represent himself in that case, and told Judge Jones the same thing when the defendant first appeared in this case. As Faretta made

17

clear, a criminal defendant has a constitutional right to represent himself and the court must honor such a choice. Faretta, 422 U.S. at 834. It would have been a violation of the defendant's Sixth Amendment right for this court to have forced counsel upon him in Case No. 16-cr-100. And the court did not force counsel on the defendant in this civil case. It offered him the opportunity to be represented by counsel, and when he accepted, it exercised its discretion to appoint counsel. The defendant squandered that opportunity.

As for the defendant's mental health, the defendant has managed, despite his protestations of mental illness, to file a staggering number of documents and pleadings in his various cases and to make numerous arguments—many accompanied by case citations. The defendant represented to the court in his motion to adjourn the April 19, 2022 evidentiary hearing that he now is taking medication; as far as the court is aware, he had not been taking medication in the years preceding that motion. Dkt. No. 109.

The defendant does not have a constitutional right to counsel in this civil case and he did not avail himself of the assistance of counsel when the court provided it. The court will not appoint successor counsel.

### III. Conclusion

The court **DENIES** the defendant's motion requesting the court to determine ownership of the American Farmland Partners Corporation Stock Warrants. Dkt. No. 96.

The court **DENIES** the defendant's motion to reconsider the court's decision denying the appointment of successor counsel. Dkt. No. 101.

Dated in Milwaukee, Wisconsin this 14th day of April, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**